THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
HERBERT L. MINER, Defendant-Appellant.

Fifth District   No. 75-392

Opinion filed February 28, 1977.

Michael J. Rosborough and Daniel M. Kirwan, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Howard L. Hood, State's Attorney, of Murphysboro (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE KARNS delivered the opinion of the court:

The defendant, Herbert L. Miner was convicted in the Circuit Court of Jackson County of "felony murder." He appeals.

On Sunday, January 12, 1975, sometime after 10 p.m., the Reverend Gary Tanner placed a telephone call to the Williamson County sheriff's department. Reverend Tanner, calling on behalf of the defendant, informed one Deputy Cradle that the defendant had been involved in a shooting earlier that night. Deputy Cradle agreed to meet Reverend Tanner and the defendant at the courthouse in Marion, Illinois. The defendant was subsequently taken into custody. Between 12 and 1 o'clock on the morning of January 13, acting upon information provided by defendant, the police discovered the body of James Starnes at the White Brother's mine, located approximately two miles northeast of Elkville, Illinois. The body was slumped over the steering wheel of a pickup truck. The truck's lights were on and its engine was running. Starnes had been shot in the face with a shotgun. In a statement given to the police shortly after his arrest, defendant had indicated that another person, Paul E. Ledbetter, was with him when Starnes was killed. The police, therefore, drove to Ledbetter's home in Elkville in order to question him. Ledbetter and his wife were home when the police arrived. They denied any knowledge of James Starnes' death and claimed to have been out together most of the night. Ledbetter was arrested and subsequently admitted that he had been involved in the homicide. Ledbetter then called his wife and instructed her to give the police his sawed-off shotgun; she did so.

The defendant and Paul Ledbetter were jointly indicted and tried for three counts of murder. The indictment charged defendants with murder under section 9—1(a)(1), (2) and (3) of the Criminal Code.[1] (Ill. Rev. Stat.

---

[1] Count I charged the defendants with murder "in that they, without lawful justification, and with the intent to kill or do great bodily harm to James A. Starnes, a male person, shot James A. Starnes with a sawed-off shotgun thereby causing his death." Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(1).

1975, ch. 38, par. 9—1(a)(1)-(3).) Prior to trial both defendants filed motions for a severance, arguing that their defenses were antagonistic and that the State planned to introduce at trial written statements made by each defendant inculpating the other.[2] Defendants relied upon these statements as evidence of the existence of antagonistic defenses. The motions for severance were denied by the trial court. Defendant Miner subsequently renewed his motion for a severance both prior to and during trial. The trial court denied the renewed motions. After a jury trial, Paul Ledbetter was acquitted on all counts of the indictment. The defendant was acquitted on the first two counts, but convicted of "felony murder" under section 9—1(a)(3). Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3).

Defendant now raises three issues for review: (1) whether the trial court erred in refusing to instruct the jury on the offense of involuntary manslaughter, (2) whether the trial court erred in refusing to present to the jury an instruction defining "attempt," and (3) whether defendant should have been granted a severance because the defenses of the codefendants were antagonistic. The following is a summary of the evidence adduced at trial.

The evidence presented by the State in its case in chief consisted almost entirely of the testimony of two witnesses. The first witness called by the State was Reverend Gary Tanner. Reverend Tanner testified that he spoke with the defendant at about 10 o'clock on the night of January 12. The defendant was very nervous and upset at that time. According to Reverend Tanner, the defendant told him that, "We killed a man or shot a man."[3] Defendant then explained that he had driven to White Brother's mine earlier that evening to look for his brother and to get

---

Count II charged that defendants performed the acts which resulted in James A. Starnes' death "knowing that said acts created a strong probability of death or great bodily harm ° ° °." Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(2).

Count III charged that James A. Starnes' death was a "direct result" of the defendants' attempt to commit armed robbery. Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3).

[2] The written statements were not introduced at trial.

[3] It is well settled that an extrajudicial statement is admissible only against the defendant making it. Such a statement is inadmissible hearsay as to any other defendant unless he adopted it as his own. (*People v. Clark*, 17 Ill. 2d 486, 162 N.E.2d 413 (1959); *People v. Nelson*, 124 Ill. App. 2d 280, 260 N.E.2d 251 (1st Dist. 1970).) Accordingly, the trial judge instructed Reverend Tanner to confine his testimony to statements by the defendant concerning his own activities and to avoid references to any other person. Despite this admonition, Reverend Tanner frequently referred to another person either directly or through the use of plural pronouns in relating what the defendant allegedly told him. The trial judge sustained frequent objections to these references, but it seems apparent that the jury was aware that the defendant's statement to Reverend Tanner implicated Paul Ledbetter. See *People v. Bravos*, 114 Ill. App. 2d 298, 315-17, 252 N.E.2d 776, 784-85 (1st Dist. 1969).

some gasoline. Defendant said that when he entered the mine property, James Starnes drove up to meet him. The men stopped and conversed. Defendant asked if his brother were there, and Starnes replied that he was not working that day. Defendant also asked Starnes if he could have some gas. Starnes said that he had two five-gallon cans, but defendant said that that was not enough to "fool with." The men then returned to their trucks and drove off. Once Starnes was out of sight, however, defendant drove back to the mine and parked next to some gasoline storage tanks located on the property. Evidently, Starnes saw the defendant drive back to the mine, because he turned around and drove toward the parked car.

Defendant told Reverend Tanner that as Starnes approached, "they got out of the car and went to the trunk, unlocked it and took out a [sawed-off shotgun]." Reverend Tanner's next statement, that "the other person handed [defendant] the gun," was objected to and the jury was instructed to disregard it. Defendant said that he tried, unsuccessfully, to cock the gun a number of times. He then got back into the car and waited for Starnes to approach. Starnes pulled up alongside the defendants' vehicle, facing in the opposite direction so that the driver's sides of the vehicles faced each other. Defendant put the barrel of the gun out the window and rested its stock in his lap. Defendant said that he didn't think the gun was loaded and "stuck it up to bluff him [Starnes]." Defendant again tried to cock the gun. He told Reverend Tanner that the person who was with him reached over and cocked the weapon, and that it then discharged. Once again, an objection to this reference to defendant Ledbetter was sustained. Defendant said that he never intentionally aimed the gun at Starnes, but Starnes was hit by the shotgun blast and slumped over the steering wheel of his truck. Defendant panicked and drove away. He stopped at a tavern, had a drink and then drove back to the mine area. Upon seeing the headlights from another car, however, he turned around and drove to Paul Ledbetter's home. Defendant told Mrs. Ledbetter that "they" had shot a man. The Ledbetters then drove the defendant to his home in Marion. Defendant subsequently contacted Reverend Tanner, who called the police. Reverend Tanner said that the defendant told the police the same story that defendant had related to him.

The next witness called by the State was John Halstead.[4] He testified that he was an Elkville police officer and knew Paul Ledbetter. Halstead said that during interrogation at the sheriff's office, Ledbetter asked to speak with him in private. Once they were alone, Ledbetter said "I am in

---

[4] The trial court tried, again without success, to limit Halstead's testimony to the activities of Paul Ledbetter. See footnote 3 above.

278

a lot of trouble." When Halstead asked why, Ledbetter replied, "I did it * * * I was there." Ledbetter went on to explain that he had gone to the mine property to steal gasoline. He said that he met James Starnes at the mine and spoke with him, and that he and Starnes then parted company, driving in opposite directions. When Starnes was out of sight, however, Ledbetter returned for the gasoline. Ledbetter said that when Starnes saw him and started driving back, Ledbetter loaded his sawed-off shotgun and handed it to defendant. Starnes pulled up and asked what Ledbetter and the defendant were doing on mine property. Ledbetter said that the barrel of the shotgun was placed over the windowsill of their car, that Starnes was shot, and that they then fled. Ledbetter told Halstead that later that evening he and defendant returned to the mine to make sure Starnes was dead. They turned around, however, upon seeing the headlights of another car. Halstead's testimony concerning subsequent events closely follows the testimony given by Reverend Tanner. He also stated that Ledbetter told him that his wife had hidden his shotgun before giving it to the police.

After submitting exhibits consisting of Ledbetter's shotgun, an autopsy report and pictures of the victim, the State rested.

Herbert Speller was the first witness called on behalf of Paul Ledbetter. Speller stated that he was presently incarcerated in the Jackson County Jail and had been confined in the jail at the same time as Ledbetter and the defendant. Speller lived in a cell next to the defendant's for an unspecified period of time and conversed with him on several occasions. Speller testified that on March 18, 1975, defendant told him that he had unintentionally killed a man. Defendant said that he put a shotgun out the window and pulled back its hammer, but could not remember what happened after that. According to Speller, defendant also said that if he had to testify at trial, he would take Paul Ledbetter to the penitentiary with him by testifying that Ledbetter reached over and pulled the trigger.

Paul Ledbetter's wife, Starla, testified that on January 12 her husband left home, alone, about 11:30 in the morning and returned with the defendant at approximately 6 p.m. Because both men appeared to be badly shaken, Mrs. Ledbetter asked what was wrong. Her husband replied that defendant had just shot and killed a man. Defendant affirmed Paul Ledbetter's statement, repeating it over and over. Defendant, suddenly remembering that Ledbetter's shotgun was still in the car, went outside and brought it in. He then demonstrated what had happened, holding the shotgun and saying, "See I was holding it just like this, and I asked Starnes, 'Do you know what this is?' and it went off." According to Mrs. Ledbetter, defendant threatened to tell the police that she had killed Starnes. He also demonstrated Starnes' facial contortions after being shot. Defendant's erratic behavior worried Mrs. Ledbetter and she asked him

to put down the gun. Defendant then unloaded the weapon and gave Mrs. Ledbetter both the gun and a spent shell. She put the shell in her pocket and hid the gun under a bed. The Ledbetters asked defendant to spend the night with them, but defendant insisted upon going home to prepare an alibi. After taking the defendant to his home in Marion, the Ledbetters returned to their trailer.

Paul Ledbetter told his wife that defendant had wanted to steal gasoline at the mine. The Ledbetters went to bed, but were awakened a short time later by the police. The police questioned both of them, and both said that they had been out together most of the night. Paul Ledbetter allowed the police to search his car, but not the trailer. The police arrested Ledbetter and said, as they were leaving, that they would return with a warrant to search the trailer. A deputy was stationed outside the trailer to await their return. While she was alone in the trailer, Mrs. Ledbetter concealed the shotgun in a mattress. Her husband called shortly thereafter, however, and instructed her to turn in the gun. She complied with her husband's wishes, giving the police both the sawed-off shotgun and the spent shell.

Paul Ledbetter testified in his own behalf. He said that he had worked at White Brother's mine from August of 1974 until shortly before Christmas. Ledbetter testified that he met the defendant, who also worked at the mine, some time in August. On January 12, 1975, defendant and Ledbetter went to a local tavern where they spent some time drinking and shooting pool. They then left the tavern to look for defendant's half-brother, William Miner. Defendant drove Ledbetter's automobile several places without finding his brother. Because William worked at White Brother's mine, the defendant decided to look for him there. According to Ledbetter, he and defendant also intended to hunt rabbits at the mine. Defendant, therefore, stopped the car before entering the mine property and took Ledbetter's sawed-off shotgun out of the trunk. Ledbetter, who was sitting next to the defendant in the front seat of the car, loaded the gun as defendant drove onto the White Brother's property. Defendant proceeded slowly down a road leading into the mine pit. Ledbetter stated that he looked at the fuel gauge and said that they needed some gas. Defendant replied, "We will get some gas at the mine." Ledbetter resisted defendant's suggestion, but defendant adamantly stated, "We don't have to buy any gas, we can go steal it." At this time, the men noticed a white pickup truck driving out of the pit of the mine. Ledbetter said to forget about stealing gas because other people were present. Defendant drove past the mine's fuel pumps, and Ledbetter assumed that he had abandoned his plan to steal gasoline. As the other vehicle disappeared from view, however, defendant said, "I am going to get the gas now," and backed up to the pumps.

The truck which the men had seen earlier returned at this time and pulled up between the vehicle driven by defendant and the pumps. The driver of the truck was James Starnes, whom Ledbetter had met while working at the mine. Ledbetter got out of the car, walked over to Starnes' truck and exchanged pleasantries with him. As Ledbetter reentered his car, the defendant aimed the shotgun at Starnes and demanded gasoline. Starnes resisted the defendant's demand, saying that he did not have a key to unlock the tanks and that they were empty anyway. According to Ledbetter, the defendant insisted that Starnes give him some gasoline and repeatedly asked, "Do you know what this gun is?" The weapon discharged, killing Starnes. Ledbetter said he did not know exactly how it happened. Ledbetter also stated that he did not touch the shotgun at any time after Starnes pulled alongside them, although he did touch the defendant's leg as he was trying to persuade defendant to leave.

After the shotgun discharged, defendant drove away, repeating, over and over, "I have killed a man." The men stopped at a tavern, had a drink, and left. Ledbetter assumed that they were going home, but defendant said they would have to go back to the mine to make sure Starnes was dead. They turned around without checking on Starnes, however, when they saw the headlights of another vehicle coming out of the mine pit. Ledbetter testified that they then returned to his home in Elkville. His further testimony corroborated Mrs. Ledbetter's.

The defendant also testified in his own behalf. His account of the events which occurred prior to the fatal trip to the mine corroborates Paul Ledbetter's. Defendant said that he and Ledbetter drove to the White Brother's mine hoping to find William Miner. He admitted driving Ledbetter's car, but denied stopping and removing the shotgun from the trunk before entering the mine property. Defendant said that he drove north from Elkville on Highway 51, turned onto an access road to the mine and parked 75 to 100 feet beyond the mine's gas pumps. Starnes then drove up in his pickup truck and stopped beside Ledbetter's car. The defendant asked Starnes if his brother were there. Starnes replied that he. was not working that day. The defendant and Starnes then drove up the access road toward the highway. When they reached the point where the road intersected the highway, Starnes turned right and the defendant turned left. Paul Ledbetter suggested, however, that they get some gas. The defendant replied, "Okay, if you want to," and backed onto the mine property, stopping, once again, 75 to 100 feet from the fuel pumps.

After defendant stopped the car, Ledbetter "suggested" that he would get the gun. Ledbetter then got out of the car, took the gun from the trunk, and walked over and handed it to the defendant. As the two men were getting back into their car, James Starnes pulled up in his truck. Defendant said that he was still holding the shotgun at this time, but did

not aim it at Starnes. He said that it was pointing out the window, aiming, "maybe a foot in front of * * *[Starnes'] windshield." Defendant admitted during cross-examination that he tried, unsuccessfully, to cock the gun both before and after Starnes reappeared on the scene. He said that he did not know the gun was loaded. When Starnes pulled up, he asked "What do you boys want?" The defendant said that he replied, "Well, I would like to get some gas." Starnes then informed defendant that the storage tank was empty, but that there were 10 gallons of gas "over by the pump" which he could have. The defendant refused Starnes' offer, saying, "If that's all the gas you got, I got some money and I will go to town and get some." Defendant said that he asked Starnes if he were going to call the police, but Starnes did not answer. According to the defendant, Ledbetter reached over and cocked the shotgun. Defendant stated that Ledbetter then said something to him and that he turned and looked at Ledbetter. The gun went off while defendant was looking at him. Defendant said that he had not touched the trigger and did not know why the gun had fired. He denied threatening anyone (including James Starnes) at any time in connection with this incident. He admitted telling Reverend Tanner that he went to the mine to get gasoline, but did not remember telling him that he bluffed Starnes with the shotgun. He denied making the statements attributed to him by Herbert Speller.

■■ Defendant's first contention is that the trial court erred in refusing to instruct the jury concerning the offense of involuntary manslaughter. It is well settled that an instruction defining manslaughter should be given if there is any evidence in the record which, if believed by the jury, would reduce the crime to manslaughter. (*People v. Papas*, 381 Ill. 90, 44 N.E.2d 896 (1942); *People v. Boothe*, 7 Ill. App. 3d 401, 287 N.E.2d 289 (2d Dist. 1972).) It is equally well settled, however, that an instruction defining the crime of manslaughter should not be given when the evidence admits only the conclusion that the crime was murder. (*People v. Handley*, 51 Ill. 2d 229, 282 N.E.2d 131, *cert. denied*, 409 U.S. 914, 34 L. Ed. 2d 175, 93 S. Ct. 247 (1972); *People v. Waldron*, 33 Ill. 2d 261, 211 N.E.2d 367, *cert. denied*, 384 U.S. 1008, 16 L. Ed. 2d 1021, 86 S. Ct. 1970 (1965).) The trial court must exercise its discretion in deciding whether the evidence requires a manslaughter instruction. *People v. Jacobs*, 44 Ill. App. 3d 290, 357 N.E.2d 821 (2d Dist. 1976).

■■ Defendant was convicted of murder under section 9—1(a)(3) of the Criminal Code. (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)(3).) That section provides that a person is guilty of murder if he kills someone while attempting or committing a forcible felony other than voluntary manslaughter. A defendant may be convicted of "felony murder" even though he had no intent to and did not personally kill the victim. (*People v. Brooks*, 51 Ill. 2d 156, 281 N.E.2d 326 (1972); *People v. Hickman*, 59 Ill.

2d 89, 319 N.E.2d 511 (1974).) In order to obtain a conviction under section 9—1(a)(3) for a homicide committed while attempting a forcible felony, the State must, of course, prove that the defendant intended to commit the underlying felony.

■■ Defendant contends that the facts developed at trial could have supported a verdict of involuntary manslaughter. He argues that the jury could have inferred that he was intoxicated at the time Starnes was killed and that he, therefore, could not have formed the specific intent necessary to commit attempt armed robbery. (See Ill. Rev. Stat. 1975, ch. 38, par. 8—4(a).) In order to raise drunkenness as a defense to a crime requiring specific intent, the accused must show that this drunkenness existed to such a degree as to render the accused wholly incapable of forming such intent. (*People v. Gonzales*, 40 Ill. 2d 233, 239 N.E.2d 783 (1968); *People v. Hare*, 25 Ill. 2d 321, 185 N.E.2d 178 (1962).) The evidence in the instant case indicates only that the defendant and Paul Ledbetter drank intermittently for several hours before traveling to the mine. Defendant's coherent and detailed recollection of the events immediately prior to the shooting belies any argument that his power of reasoning was suspended. *People v. Gonzales; People v. Jacobs*, 44 Ill. App. 3d 290, 357 N.E.2d 821 (2d Dist. 1976).

■■ The only conclusion which could have been reached on the evidence in the instant case was that defendant was attempting to commit armed robbery when James Starnes was killed. It would, therefore, have been improper for the jury to have convicted the defendant of involuntary manslaughter. Factual details such as who, if anyone, pulled the trigger, were, therefore, irrelevant. (See *People v. Weathers*, 18 Ill. App. 3d 338, 309 N.E.2d 795 (1st Dist. 1974).) The trial court did not abuse his discretion in refusing to instruct the jury on involuntary manslaughter.

■■ Defendant's next contention is that the trial court erred in refusing to present to the jury an instruction defining "attempt." That instruction merely recited the statutory definition of the offense of attempt armed robbery (Ill. Rev. Stat. 1975, ch. 38, par. 8—4(a)), stating that:

> "A person commits the crime of attempt who, with intent to commit the crime of armed robbery, does any act which constitutes a substantial step toward the commission of the crime of armed robbery." (IPI—Criminal No. 6.05.)

Such an instruction is not called for in the Committee Notes following the Illinois Pattern Instructions applicable to felony murder cases. (See IPI—Criminal No. 7.01, Committee Note.) Defendant argues, however, that the failure to define "attempt" allowed the jury to find defendant guilty of felony murder without finding that he intended to commit armed robbery. We disagree. The jury was given Illinois Pattern Instructions

defining felony murder (IPI—Criminal No. 7.01) and armed robbery (IPI—Criminal No. 14.01), as well as an instruction setting forth the issues which must be resolved in felony murder cases. (IPI—Criminal No. 7.02.) In substance, these instructions required the jury to find the defendant guilty of murder if he killed James Starnes in attempting, while armed with a dangerous weapon, to take property from Starnes' person or presence by the use of force or by threatening the imminent use of force. According to Webster's Third New International Dictionary, the word "attempt" means, "to make an effort to do, accomplish, solve, or effect * * *." That one must intend to do that which one is attempting is implicit in the foregoing definition. (See R. Perkins, Perkins On Criminal Law 573 (2d ed. 1969).) We feel that the jury so understood the use of the word "attempt" in the instructions given. Where the terms employed in an instruction are of general use, and are not technical terms or words of art, they need not be defined, in the absence of anything in the charge to obscure their meaning. *People v. Monroe*, 32 Ill. App. 3d 482, 335 N.E.2d 783 (3d Dist. 1975).

■■ Finally, defendant argues that he should have been granted a severance because Paul Ledbetter's defense at trial was antagonistic to his. Generally, persons jointly indicted should be jointly tried. (*People v. Brown*, 27 Ill. App. 2d 569, 327 N.E.2d 51 (2d Dist. 1975).) Separate trials are required only when the defenses of the defendants are so antagonistic that a fair trial can be assured only by a severance. (*People v. Brooks*, 51 Ill. 2d 156, 281 N.E.2d 326 (1972).) To obtain a severance, the defendant must demonstrate prior to trial how he would otherwise be prejudiced. (*People v. Rhodes*, 41 Ill. 2d 494, 244 N.E.2d 145 (1969); *People v. Perry*, 27 Ill. App. 3d 565, 327 N.E.2d 259 (2d Dist. 1975); *People v. Merritt*, 16 Ill. App. 3d 72, 305 N.E.2d 579 (1st Dist. 1973).) Defendant's motion for a severance must set out specific grounds showing why a severance is necessary, and mere apprehension that defenses may prove to be antagonistic is insufficient. (*People v. Davis*, 43 Ill. App. 3d 603, 357 N.E.2d 96 (1st Dist. 1976); *People v. Yonder*, 44 Ill. 2d 376, 256 N.E.2d 321 (1969).) Where the motion fails to show how a defendant would be prejudiced, the court in its judicial discretion need not grant a severance. *People v. Pulaski*, 15 Ill. 2d 291, 155 N.E.2d 29 (1958).

■■ The only evidence before the trial court when it ruled upon the defendants' pretrial motions consisted of the extrajudicial statements of both defendants. Defendant Miner's statement was substantially similar to his trial testimony, although it did not elaborate upon the events and conversations which occurred immediately prior to the shooting. Ledbetter's statement differed significantly from his testimony, but the differences are unimportant for present purposes. Because defendant Miner was convicted only of felony murder, we need only consider

whether the statements sufficiently demonstrated antagonistic defenses to that crime. Each statement indicated that Miner was holding Paul Ledbetter's shotgun when it discharged, killing James Starnes. The statements differed, most importantly, in the reasons which they gave for the trip to the mine. Miner's statement indicated that he was looking for his brother. Ledbetter said that the purpose was to steal gasoline. Miner's statement, however, does not explain why he accepted the shotgun when Ledbetter handed it to him nor why he tried to cock the weapon when it was in his possession. The statement also left open the possibility that Miner had reasons for going to the mine in addition to a desire to find his brother or that Miner decided to participate in Ledbetter's plan to steal gasoline after reaching the mine. Under these circumstances, we feel that the statements raised, at most, mere apprehension that the defenses would prove to be antagonistic. On the evidence before him, the trial court did not abuse his discretion in refusing to grant separate trials.

■■ At trial, defendant did not admit that he was attempting to commit armed robbery, although he did admit that he wanted to steal gasoline. According to the defendant, he was innocently holding and "playing" with the hammer of a sawed-off shotgun while conversing with James Starnes. Defendant admitted asking Starnes if he could have some gasoline, but said that he refused to accept Starnes' last 10 gallons, stating, "if that's all the gas you got, I got some money and I will go to town and get some." Paul Ledbetter's testimony, however, clearly indicated that defendant was brandishing the shotgun and demanding gasoline from Starnes when the weapon discharged. Ledbetter's testimony was obviously antagonistic to defendant's defense. Prior to trial, however, the court had no indication of what the testimony of the defendant and Ledbetter would reveal. This case is, therefore, distinguishable from *People v. Braune*, 363 Ill. 551, 2 N.E.2d 839 (1936), a case relied upon by defendant. In *Braune* the trial court denied a motion for a severance even though evidence was presented, prior to trial, indicating that each defendant would take the witness stand and testify to a set of facts which would be exculpatory of the witness and condemnatory of his codefendant. The supreme court held that separate trials should have been granted, stating that it was aware of, "no decided case where such a situation had been brought to the attention of the court prior to the trial and a severance was denied." (363 Ill. 551, 555, 2 N.E.2d 839, 841.) As noted, there was no indication prior to trial in the instant case that antagonistic defenses to the felony murder charge would be presented. Defendant argues that a showing of antagonistic defenses may be made either prior to or during trial. This proposition, however, contradicts several supreme and appellate court opinions which clearly state that a showing of antagonistic defenses must be made prior to trial.

■■ Moreover, we feel that the defendant, in fact, received a fair trial. The only evidence adduced at the joint trial which would have been inadmissible had the defendant been tried separately was the testimony of John Halstead. As noted, Halstead was permitted to testify concerning a statement made by Paul Ledbetter implicating the defendant. Defendant was not thereby deprived of his right of confrontation, however, because Ledbetter testified at trial and was subject to cross-examination by defendant's counsel. (See *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968); *California v. Green*, 399 U.S. 149, 26 L. Ed. 2d 489, 90 S. Ct. 1930 (1970); *Nelson v. O'Neil*, 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723 (1971); *People v. Williams*, 105 Ill. App. 2d 25, 245 N.E.2d 17 (1st Dist. 1969).) A statement does not become admissible against the nondeclaring codefendant merely because he receives confrontation and the opportunity to cross-examine. In order to admit such a statement at a joint trial, therefore, all references to the nondeclaring codefendant should usually be deleted. In the instant case, however, another State's witness, Reverend Tanner, testified concerning a similar extrajudicial statement made by the defendant. In that statement, the defendant admitted that he intended to steal gasoline at the mine and that he used a shotgun to bluff James Starnes. In *People v. Rosochacki*, 41 Ill. 2d 483, 244 N.E.2d 136 (1969), the court held that the admission of a codefendant's statement inculpating the defendant was harmless error where the defendant had made substantially similar statements and where the other evidence against the defendant was convincing and adequate to support a guilty verdict. In so holding the court reasoned that:

> " * * *[A] very substantial difference exists between a case in which a jury hears a co-defendant's statement incriminating a defendant who has himself made similar inculpatory admissions, and the *Bruton*-type case in which the co-defendant's statement is used against a defendant who has made no admissions. In the former case the prejudice to the defendant, if any, is minimal, and entirely insufficient to necessitate retrial, particularly where, as here, defendant's guilt seems clear. There can be no doubt that the jury placed far greater emphasis on Rosochacki's self-incriminating admissions than on the hearsay statements of his co-defendant." (41 Ill. 2d 483, 494, 244 N.E.2d 136, 142.)

The two statements involved in the instant case differed in certain respects, but were virtually identical on the issue of felony murder. Other evidence of defendant's guilt was convincing. We feel, therefore, that the admission of John Halsteads' testimony constituted harmless error.

■■ Defendant also complains that Paul Ledbetter's counsel was allowed to cross-examine him concerning prior inconsistent statements

and a prior conviction for burglary. Because the State introduced defendant's extrajudicial statement inculpating Ledbetter, the confrontation clause required that Ledbetter be given an opportunity to cross-examine the defendant, once the defendant chose to testify. (See *Nelson v. O'Neil*, 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723 (1971); *People v. Williams* 105 Ill. App. 2d 25, 245 N.E.2d 17 (1st Dist. 1969); *People v. Allison*, 325 Ill. 578, 156 N.E. 798 (1927).) When a defendant elects to take the witness stand, he makes himself subject to cross-examination and impeachment just as any other witness. (*People v. Zaeske*, 67 Ill. App. 2d 115, 213 N.E.2d 577 (2d Dist. 1966).) The questions asked by Ledbetter's counsel concerning defendant's prior inconsistent statements were within the scope of permissible cross-examination. In light of the overwhelming evidence of defendant's guilt, we feel that any error resulting from the brief reference to defendant's prior burglary conviction was harmless. (*People v. Armstrong*, 22 Ill. 2d 420, 176 N.E.2d 755 (1961).)

For the foregoing reasons, defendant's conviction is affirmed.

Affirmed.

CARTER, P. J., and JONES, J., concur.