THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* BEN DORSEY, Defendant-Appellant.

First District (4th Division)    No. 80-247

Opinion filed September 18, 1980.

James B. Haddad, of Northwestern Legal Assistance Clinic, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Iris E. Sholder, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

Defendants, Ben Dorsey and Leon Harris, were charged with murder (Ill. Rev. Stat. 1973; ch. 38, par. 9—1) and attempt armed robbery (Ill. Rev. Stat. 1973, ch. 38, par. 8—4) of Roger Walton. Following a jury trial, both defendants were found guilty of murder and not guilty of attempt armed robbery. They were sentenced to serve a term of 14 years to 14 years and 1 day in the Illinois Department of Corrections. Defendant Dorsey asserts on appeal that (1) the court erred in denying his request for severance from Leon Harris; (2) failure to give a limiting instruction prohibiting jury use of the Harris statement as evidence against Dorsey was plain error; (3) the trial court erred in extending the speedy trial term; (4) he was prejudiced by deliberate prosecutorial defiance of the court's ruling that conversations between Mattie Grady and the police were irrelevant; (5) noncumulative, critical, hearsay testimony about the failure of Gene Williams to identify Curtis Nelson requires reversal; (6) the trial court erred in receiving certain evidence from Gene Williams; (7) the trial court applied an erroneous standard in excluding evidence from the victim; (8) he was denied his right of confrontation when the court prevented inquiry into the address of the State's chief witness; (9) appointed counsel's defaults deprived him of a fair trial and full and timely appellate review; (10) misconduct on the part of the prosecutor deprived him of a fair trial; and (11) the errors in this case were not harmless.

In April 1975, defendants Leon Harris and Ben Dorsey were charged by indictment with three counts of murder and one count of attempt armed

robbery. On April 13, 1976, defendant Harris filed a petition for severance of his trial from that of defendant Dorsey. Defendant Dorsey joined in that petition at a hearing held on October 6, 1976, at which time the petition was denied.

On October 15, 1976, the State filed a petition for a 60-day extension of time with respect to the trial of defendant Dorsey. In support of its petition, the State presented Donald Conley, a State's Attorney investigator, who testified that he was assigned to locate Mattie Grady, an alleged eyewitness. He stated that he went to 7016 South East End Avenue, in Chicago, and learned that no one by that name lived there. Investigator Conley also contacted the Chicago police department, the United States Postal Service, and the Department of Public Aid, none of which had any records under the name Mattie Grady. He further contacted certain agencies in Biloxi, Mississippi, at the suggestion of his fellow investigator, Russell McKibben. He communicated with the Mississippi police department, which was to contact the Department of Public Aid in Biloxi. Conley stated he had not received any word from the Biloxi police department or the Department of Public Aid, nor had he attempted to reach them after the initial call. The court granted the 60-day extension.

Prior to trial, the Assistant State's Attorney informed the court of the State's intention to introduce the prior written statements of defendants Harris and Dorsey. He indicated the statements would be edited to avoid references to a co-defendant. The defense attorneys objected, arguing that excising the statements would not eliminate the possible prejudice that could result from their admission into evidence. The trial court determined the statements, as edited, were admissible.

The prosecution called Gene Williams as its first witness. He testified that on February 13, 1975, at 4:15 a.m., he was at the home of a friend who resided at 52d and Aberdeen. He and his friend, Eddie, left there and took a Checker taxi to 47th and Shields. According to Williams, Eddie left while he waited in the cab with the driver. About 10 to 15 minutes later, a Cadillac automobile with several occupants pulled along side the taxi and stopped. The occupants looked into the cab, whereupon the driver backed the car toward the corner of 48th Street and stopped. Two men got out of the Cadillac and walked toward the cab. When they were only a few feet away, the men stopped and then ran the remaining distance to the taxi. Williams was able to see the faces of the two men, whom he later identified as Ben Dorsey and Leon Harris. According to the witness, each man had a pistol. Dorsey was on the driver's side of the cab and Harris was on the passenger's side. Dorsey said a few words, and then Dorsey and Harris began shooting. Williams testified that because he had ducked onto the floor of the back seat of the cab, he did not see the shooting, but he heard about a dozen shots. When the shooting stopped, he heard the men running

away; he rose to watch them as they ran back to the Cadillac. The defendants got into the car and drove away. Williams stated he got out of the taxi and attempted to make the driver comfortable before looking for assistance. He returned to aid the cab driver until the police arrived.

Williams attended a lineup on February 14, 1975, where he identified Harris. He also attended a lineup on March 24, 1975, at which time he identified Harris and Dorsey.

Williams also testified that as a juvenile he was found delinquent and guilty of aggravated battery and voluntary manslaughter. As an adult, he had been convicted of burglary, delivery of a controlled substance, possession of a hypodermic needle, and shoplifting, twice. At the time of trial, a charge was pending against him for possession of a "1 tin" bag of heroin. He further testified that he used heroin between the winter of 1975 and May 1976, but he had not used any narcotics since that time.

Officer Wayne Raschke testified that on February 13, 1975, after receiving a telephone call, he went to 4750 South Shields where he observed a man standing in the doorway of the driver's side of a Checker cab. The man was holding the driver up on the seat of the cab so as to prevent his falling to the floor. The driver, Roger Walton, was bleeding from both sides of his upper body and arms. The officer identified the other man as Gene Williams. The officer stated that Williams was bleeding from the hand and neck. Prior to both men being taken to the hospital, Williams related the incident to Officer Raschke and described both offenders.

Prior to cross-examination of Officer Raschke, the State presented a motion to preclude defense counsel from eliciting testimony concerning any conversation beween Officer Raschke and Roger Walton. Defense counsel stated he intended to show that the victim had made a dying declaration. Following an *in camera* hearing during which Officer Raschke was questioned, the court ruled that any statements made by the victim did not qualify as a dying declaration.

Assistant State's Attorney Irwin Solganick testified that on February 13, 1975, at about 8:30 p.m., he spoke to Ben Dorsey at the police station. Dorsey gave an oral statement to him and agreed to give one before a court reporter. Solganick stated he then spoke to Mattie Grady, defendant Dorsey's girl friend, who told him she witnessed the incident. Additional references were made to Mattie Grady, and both defense counsels moved for a mistrial. The motion was denied.

Solganick read Dorsey's edited statement to the jury. Dorsey acknowledged he had been at the scene in his 1968 Cadillac. He conceded that after the shooting he was afraid, left the scene, and initially denied involvement. He stated that after leaving a party at 4713 South Shields he, Mattie Grady, two men and two other women got into his car. They drove to 48th and

Shields so that Dorsey could obtain a radiator from an all-night junkyard. After he left the junkyard and returned to his car, one of the men in the car, Curtis, said Dorsey could drop him at that point since there was a taxi further up the street. Curtis began walking toward the cab. The other man in the car got out and began walking toward the junkyard. Dorsey saw Curtis standing on the driver's side of the taxi. Next, Dorsey heard shots and saw Curtis running back toward the car. Dorsey drove his car into the alley; the other man got into the car and they drove away.

Assistant State's Attorney Arthur Stefans testified he interviewed defendant Harris at the police station on February 14, 1975. In Harris' edited statement, he said that at 3:30 a.m. on February 13, 1975, he left a wake at 4714 South Shields with his girl friend, Carol, Curtis Nelson and Mattie Grady. They all went in one car to his home at 4765 South Shields. Harris stated that at about 4:30 a.m. "he" left and then returned approximately 10 minutes later. "He" then asked Harris to help him rob a cab driver, but Harris refused because he did not want to run the risk of violating his parole. "He" had a gun and told Harris if the man "acted funny" he would shoot him. Harris stated that "he" was standing approximately 2 feet from the driver's side of the cab. "He" shot the cab driver from the passenger's side, and then "he" went around to the back of the cab. "He" stated the cab driver had a gun, but Harris did not see one in his hand. "He" began shooting, firing five times. Nelson was standing next to the taxi during the shooting. Thereafter, Nelson and "he" ran from the scene.

According to Harris' statement, he and his mother were standing on the front porch of his house, approximately 300 feet from the cab, during the shooting. His mother went inside when she heard the shots, but Harris remained on the porch until the incident was over. Thereafter, he went inside and went to bed. About 2 hours after the shooting, Harris went to Curtis' house. While there, "he" stated the cab driver had a gun, and when the driver pointed it at him, "he" began to shoot.

The State rested its case. No witnesses were presented by defendant Dorsey.

Leon Harris called his brother, Stephen Harris, to testify. Stephen stated that on February 16, 1975, Gene Williams came to his house and asked to speak with his mother. Williams told Stephen he had a "habit" to support and if he received $500 he would not appear in court since he knew Leon was innocent. Stephen's mother entered the room and Williams repeated the statement that it was worth $500 to him not to appear in court. Williams then left, returning to the Harris home the next day. According to the witness, after telling Williams that his mother had not left the $500, they went to Stephen's employer, J. W. McNairy. McNairy testified that Williams asked Stephen for the $500 in the garage. McNairy also stated that

Williams returned to the garage within 2 hours, but Stephen was not there. Williams never received any money.

Following closing arguments, both defendants were found guilty of murder. Defendant Harris appealed his conviction, which was affirmed in *People v. Harris* (1979), 70 Ill. App. 3d 363, 387 N.E.2d 1109.

Defendant contends the court erred in denying his request for severance from Leon Harris. The State asserts the denial was proper where the trial court determined that the factors forming the basis of defendant's claim of antagonistic defenses could be eliminated and were, thereafter, eliminated from the trial. Defendant contends the defenses of him and Leon Harris were antagonistic and, therefore, severance should have been granted.

■■ The general rule is that persons jointly indicted should be jointly tried, and separate trials are required only when the defenses are so antagonistic that a fair trial can be achieved only through severance. *People v. Miner* (1977), 46 Ill. App. 3d 273, 283, 360 N.E.2d 1141, 1149.

Before trial, defendant Harris filed a written motion for severance. He alleged that his defense was inconsistent with that of Dorsey and that Dorsey had inculpated Harris in the offense. Dorsey joined in the motion for severance, wherein the court refused to sever. In December, before trial, defendants again moved for severance and renewed arguments were presented, but the trial court ruled that it would not sever and that a fair trial could be achieved through editing the statements.

Ben Dorsey's statement accused Curtis Nelson and Leon Harris of shooting Roger Walton. Editing of the statement changed Dorsey's theory of the case. The edited statement eliminated the second participant, and Dorsey was made to appear to have said that only one person approached the taxi and shot Walton. This statement was unbelievable in view of Williams' testimony describing two gunmen and the physical evidence which suggested that bullets were fired from both sides of the cab.

If there had not been a joint trial, Dorsey would have been entitled to have his entire statement read into evidence, rather than an edited version of what he told the assistant State's Attorney. (*People v. La Belle* (1966), 18 N.Y.2d 405, 410, 122 N.E.2d 727, 729.) Destruction of Dorsey's theory that the two assailants were Nelson and Harris was highly prejudicial to his case. The State argues that defendants' motion for severance must set out specific grounds showing why severance is necessary. However, in a recent case, *People v. Jones* (1980), 81 Ill. App. 3d 724, 401 N.E.2d 1325, the court elaborated on that rule.

In *Jones*, a theft occurred at a pizza shop. At the hearing on the motion to sever, defense counsel stated that defendant's co-defendant would testify that he and defendant were present at the pizza shop but he left first

and did not see what the other defendant did. He also stated that defendant would testify he was not there and the evidence would give a strong inference that one of the defendants had taken the money. The motion to sever was denied. The court stated:

> "*Yonder* speaks of the reviewing courts passing upon the propriety of the denial of a request for severance as to defendants solely upon the allegation of the petition to sever. We conclude that we may also consider the representation of counsel made at the hearing on the petition." (*Jones*, at 728.)

The court went on to say that although defendant's presence at the scene would not have been enough to convict, when coupled with the circumstantial evidence it would infer his guilt.

In the present case, defense counsel stated that even with the editing of the statements it would not prevent prejudice, since there were only two defendants and the jury would imply whichever name was left out to the other defendant. Counsel also stated that each defendant exculpated himself and accused the other, and that redacting the statement would not remedy the implications.

In Harris' statement, the implication that Dorsey had been one of the gunmen was not eradicated. The statement given by Harris was redacted, but not to the extent to prevent the jury from realizing that two gunmen were involved in the death of Walton and the possibility that the other gunman was defendant Dorsey. Throughout the reading of the Harris statement, the word, "he" was interjected. Harris saw "he" and Curtis Nelson approach the cab. Harris saw that "he" was armed, but Harris did not see anything in Nelson's hand.

■■ In *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, the Supreme Court held that in a joint trial an out of court statement by one co-defendant, which implicates a second co-defendant, violates the latter's right of confrontation, especially when the co-defendant making the statement cannot be subjected to cross-examination at trial.

■■ In the present case, neither defendant testified at trial and both redacted statements were read to the jury. It is clear that a *Bruton* violation occurred when Harris made reference to "he" throughout his statement, implicating Dorsey as the second gunman. Without Dorsey having the opportunity to confront Harris, his sixth amendment right was denied.

In *State v. Young* (1965), 46 N.J. 152, 159, 215 A.2d 352, 356, the court stated that when a confession made by one defendant implicates his co-defendants and the prosecutor intends to use it at a joint trial, there must be an effective deletion of all references to co-defendants without prejudice to the confessing defendant. The court went on to hold that to effectively delete, there must be the elimination of not only direct and indirect identi-

fication but also statements that could be damaging to co-defendants once their identity has otherwise been discovered. *Young* cites an Illinois case which has some similarity to the instant case, *People v. Johnson* (1958), 13 Ill. 2d 619, 150 N.E.2d 597.

■■ In *Johnson*, the State substituted throughout the statement the word, "Blank" for the name of defendant before his co-defendant's statement was admitted into evidence. The court stated:

"In spite of the deletions made in the statement of Vance and also of the substitution of the word 'Blank' for the name of the defendant Johnson here, there still remained in such statement sufficient identifying material to advise the jury that the person 'Blank' was none other than the defendant Johnson." *(Johnson,* at 624).

The edited statement of Harris with the use of "he" was equally inadequate to protect defendant's rights.

Ben Dorsey and Leon Harris had antagonistic defenses, which were disclosed before the trial began. The trial court should have granted a severance to eliminate any possible prejudice.

Since we conclude this cause must be reversed and remanded for a new trial for failure to grant a severance, we need not consider the other issues raised.

Reversed and remanded.

LINN, P. J., and ROMITI, J., concur.