.The People of the State of Illinois, Plaintiff-Appellee, *v.* Kenneth Gene Aguirre, Defendant-Appellant.

(No. 73-329; )

Second District (2nd Division)—August 8, 1975.

Ralph Ruebner and Phyllis J. Perko, both of State Appellate Defender's Office, of Elgin, for appellant.

James M. Carr, State's Attorney, of Sycamore (James W. Jerz and Edward N. Morris, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE THOMAS J. MORAN delivered the opinion of the court:

Defendant was charged in a 13-count indictment with attempted murder, aggravated battery, aggravated assault, and disorderly conduct. After a bench trial, he was found guilty of two counts of aggravated battery against two police officers, one count of aggravated assault against a police officer, and disorderly conduct. He was sentenced to concurrent prison terms of 1 to 3 and 1 to 5 years for aggravated battery, and fined $100 for disorderly conduct. He was not sentenced for the lesser included offense of aggravated assault.

On appeal, defendant asserts that he was not proven guilty of aggravated battery beyond a reasonable doubt, and that the trial court abused its discretion by denying the defendant probation.

Evidence reveals that at approximately 10 p.m. on the evening of January 19, 1973, the defendant consumed 1½ capsules of a substance which contained an undetermined amount of lysergic acid diethylamide, commonly known as LSD, and also drank four small glasses of wine. He appeared normal at this time. At approximately midnight, defendant, along with his brother and a friend, arrived on the campus of Northern Illinois University, and were escorted by defendant's sister to a room of the dormitory in which she lived. There, joined by five other young women, the defendant and the others drank an undetermined quantity of alcoholic beverages and smoked an undetermined amount of marijuana.

In the room, defendant first reclined on the floor and mumbled to himself. Later he moved to a position on the top bunk-bed where he removed his shirt and shoes. Everyone else in the room remained fully clothed. A witness characterized defendants' speech as mumbled and said that he could not be understood but she attributed her lack of understanding to the fact that she was "high" on wine and marijuana. Defendant's removal of his shirt was thought by another witness to be due to the fact that the room was "quite warm." At one point, the defendant jumped off the top bunk and stated that he wanted to make love to all the women in the room. At another point, he was observed laughing while he looked at himself in the bathroom mirror.

The defendant and the others left to attend an "after set" party in the basement of another dormitory. Upon entering the lobby of that building, defendant communicated with certain unknown individuals and hostile words were exchanged. Defendant's attitude at this time was characterized as loud, obnoxious and provoking.

Some time after 2 a.m. on January 20, 1973, Northern Illinois University police officers Lawson and Phifer, on duty and in uniform, observed defendant nude in a skylight leading to the roof of the dormitory. They grabbed defendant and a struggle ensued during which defendant

gained control of Lawson's service revolver by ripping it through the stitching of the hip holster. Defendant fired the revolver a number of times. Phifer was struck in the head by ricochetting bullet fragments and defendant's knee was struck by either a direct hit or by ricochetting fragments.

As soon as the shooting stopped, Lawson grabbed the defendant; the latter bit the officer on the arm and chest. Phifer rejoined the struggle, struck the defendant four or five times in the face, and radioed for assistance. Defendant continued to struggle with the officers until he was subdued by the shackling of his hands and feet and thereafter he continued to thrash about violently. His facial expression was described as one of anger or belligerence and as denoting an intoxicated stupor.

Concerned that defendant was not alone, the officers twice asked him who was with him. Defendant replied, "My mother," and "You know Richard Nixon." His words and general attitude were described by a third officer as incoherent and sarcastic.

Shortly thereafter, defendant was transported to the hospital for treatment of his wounds. The doctor who attended him described defendant's behavior as agitated, hostile, aggressive, sarcastic and flippant. The doctor also stated that he believed the defendant was suffering from delusions, a belief based upon the fact that defendant answered "Rumplestilskin" when asked his name. Defendant was vulgar and spit. The doctor noted that defendant's behavior was not rational and that his responses were not communications.

After indictment, in answer to the State's discovery motion, the defendant notified the State that he intended to "assert the affirmative defense of lack of mental state necessary to commit the offenses enumerated in the indictment." See Ill. Rev. Stat. 1971, ch. 38, §§ 6—3 and 6—4.

At trial, a psychiatrist called by defendant was asked a hypothetical question based upon defendant's version of the facts. The doctor answered that, in his professional opinion, the person described did not have the conscious purpose or objective to cause bodily harm to the two officers. His opinion was based upon the fact that the person came into the period of bizarre, totally incoherent behavior from a period of normal behavior and remained "crazy" up to the end of the narrative. The doctor labeled this person temporarily psychotic, and noted that the time of the occurrence was a cold winter's night and a nude man trying to climb through a skylight was not responding to reality. The doctor was more impressed with evidence of the person's "craziness" than with what he took, but noted that it appeared the person had taken a substantial amount of LSD which causes time and space to become distorted and the brain to become disrupted.

The trial court found that the evidence left a reasonable doubt as to the defendant's ability to form the requisite mental state for attempt murder but found that the evidence demonstrated beyond a reasonable doubt that the defendant was able to form the requisite mental state for the crime of aggravated battery.

■■ The aggravated battery indictments charged defendant with intentionally committing batteries upon officers Lawson and Phifer. For the State to prove that the defendant acted intentionally, it must introduce evidence which demonstrates beyond a reasonable doubt that the defendant's conscious purpose or objective was to commit a battery upon the officers. (Ill. Rev. Stat. 1971, ch. 38, § 4—4). Ordinarily, the requisite mental state can be inferred from the character of the act. But once a defendant has introduced evidence to show that a drugged condition negated the existence of the requisite mental state and such evidence raises a reasonable doubt, the State must then overcome the affirmative defense by proving, beyond a reasonable doubt, the existence of the requisite mental state. (Ill. Rev. Stat. 1971, ch. 38, § 3—2(b); *People v. Redmond,* 59 Ill.2d 328 (1974); LaFave & Scott, Handbook on Criminal Law ch. 1, § 8, at 48 (1972).) This can be accomplished by expert testimony or by evidence of lucid periods before, during or after the voluntary act.

■■ It is undisputed that defendant's evidence was sufficient to raise a reasonable doubt as to his ability to form the requisite mental state for the crime of aggravated battery, but there remains the question of whether the State's evidence was sufficient to rebut defendant's evidence and proved beyond a reasonable doubt the nonexistence of the affirmative defense. In a bench trial, it is for the trial court to determine the credibility of the witnesses and to make a finding of fact as to whether the guilt of the accused has been established. We will not set aside the trial court's judgment unless the proof is so unsatisfactory that it gives rise to a reasonable doubt of guilt. *People v. Walcher,* 42 Ill.2d 159, 165 (1969); *People v. Smith,* 26 Ill.App.3d 1062, 1065 (1975); *People v. Behning,* 130 Ill.App.2d 536, 540 (1970).

In order for voluntary intoxication or a drugged condition to be a legal excuse, the condition must be so extreme as to suspend all reason and make impossible the existence of the mental state which is an element of the crime. (*People v. Walcher,* 42 Ill.2d 159, 163 (1969); *People v. Gonzales,* 40 Ill.2d 233, 241 (1968); *People v. Hicks,* 35 Ill.2d 390, 397 (1966); *People v. Winters,* 29 Ill.2d 74, 80-81 (1963); *People v. Strader,* 23 Ill.2d 13, 21 (1961); *People v. Cochran,* 313 Ill. 508, 518 (1924); *People v. Fuller,* 17 Ill.App.3d 1005, 1007 (1974); *People v. Wicker,* 4 Ill.App.3d 990, 996 (1972).) The question is not whether the defendant

was intoxicated or drugged but whether the evidence demonstrates beyond a reasonable doubt that, in spite of his altered consciousness, he could have formulated the requisite mental state for the crime charged. See *People v. Huggy*, 19 Ill.App.3d 247, 252 (1974); *People v. Davis*, 6 Ill.App.3d 622 (1972).

The evidence presented by the State reveals that prior to the altercation the defendant was able to control his desires, restraining himself from attempting to "make love to all [or any] of the women in the room," and again, refraining from engaging in a physical struggle with the unknown individual in the dormitory lobby.

While after the altercation defendant asserted he was in company with his mother and Richard Nixon, and later, that he was Rumplestilskin, the trial court need not have accepted these as delusions or manifestations of irrationality. The evidence presented by the State reveals that these apparently nonresponsive answers were given in a manner that denoted sarcasm and flippancy. Such answers would then evidence a basic understanding of the questions and a capacity to give a sarcastic response.

The State's evidence demonstrates beyond a reasonable doubt that both before and after the altercation defendant had lucid periods during which his reasoning power functioned, that the defendant's apparently irrational behavior was, upon analysis, the outward manifestation of an arrogant, sarcastic, and provoking personality, and not the actions of a person whose power to reason had been totally suspended. We therefore find that the State's evidence demonstrates beyond a reasonable doubt that defendant's intoxicated and drugged condition did not suspend all of his power to reason and that he could have formulated a conscious purpose or objective to commit a battery upon the officers. *Cf. People v. Redmond.*

■■ Defendant next maintains that he was not proven guilty of aggravated battery beyond a reasonable doubt in that his unrebutted evidence proved him to be insane at the time of the offense. Defendant did not raise the defense of insanity at trial. The record expressly demonstrates that the defendant's theory of the case at trial was predicated upon the affirmative defense of an intoxicated and drugged condition and not upon the affirmative defense of insanity. The issue concerning an affirmative defense cannot be raised for the first time on appeal. (*People v. Abrams*, 48 Ill.2d 446, 458 (1971).) We, therefore, do not consider this issue.

■■ Defendant contends that the trial court abused its discretion in denying his request for probation, and that he should be granted probation by this court. Attacking two officers of the law is a serious offense, and the use of a firearm during commission of such offense significantly

aggravates the cause. A sentence of probation would deprecate the seriousness of the offense and would be inconsistent with the ends of justice. Under the circumstances here, the trial court did not abuse its discretion by denying probation and entering the minimum sentence for each offense.

Judgment affirmed.

RECHENMACHER, P. J., and DIXON, J., concur.