THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PHILLIP L. JACOBS, Defendant-Appellant.

Second District (1st Division)   No. 71-134

Opinion filed November 30, 1976.

Ralph Ruebner, J. Daniel Stewart, and Michael M. Mulder, all of State Appellate Defender's Office, of Elgin, for appellant.

William V. Hopf, State's Attorney, of Wheaton, and Charles D. Sheehy, Jr., of Elgin (Malcolm F. Smith, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE GUILD delivered the opinion of the court:

The defendant, Phillip L. Jacobs, was convicted by a jury for the murder of Jane Harding, his ex-fiance and sentenced to 45-65 years in prison.

Defendant has raised five issues for review in his brief and supplement thereto. The first issue raised is whether the trial court committed reversible error in failing to instruct the jury on the lesser included offense of voluntary manslaughter as the evidence showed the defendant was seriously provoked by the deceased; that the evidence showed the defendant lacked the requisite specific intent necessary to constitute murder; and lastly, that the trial court's refusal to give the voluntary manslaughter instruction and verdict form violated defendant's right to due process and equal protection. The other issues raised are, respectively, whether the defendant was deprived of a fair trial by allegedly improper remarks of the prosecutor in his closing argument; whether the trial court erred in sentencing the defendant without first obtaining a presentence report or additional background information as to the defendant; whether defendant's sentence should be reduced; and whether the defendant was improperly convicted of two counts of murder where there was but one killing.

■■ The State concedes, and we agree, that the last contention is correct. We, therefore, find that the mittimus should be amended to show but one murder conviction.

On the evening of June 20, 1970, shortly before midnight, the defendant killed Jane Harding by stabbing her 42 times with a screwdriver. After the incident the defendant drove directly to the Naperville Police Department with the body and reported the crime. About 12 p.m. Officer Hoyer and Sergeant Rowe took the defendant into custody and read him the *Miranda* warnings. Detective Ley of the Du Page County sheriff's office testified that he saw the defendant at the Naperville police station that night for about 20 minutes. Defendant told Detective Ley that he had taken a drug earlier that night, however, Detective Ley said that he noticed nothing unusual about the defendant, saying that defendant was "very quiet, but normal." At 3:10 a.m. defendant consented to allow Dr. Kupke to take a blood sample from him. That test indicated that the defendant had 0.075% alcohol in his blood but showed no trace of any drug.

The record reveals that the defendant and Jane Harding were engaged about a year before the homicide but recently they had not been dating

regularly. Defendant testified that he was the one who terminated the relationship because of her immaturity. On June 21, 1970, Miss Harding was scheduled to attend summer school in Wisconsin. On June 20 she was spending the night with Ken and Carol Gurski, mutual friends of both Miss Harding and the defendant. That night the defendant stopped by the Gurski's house with several friends and defendant and Miss Harding had a disagreement. About 10:30 Miss Harding left the Gurski home with the defendant in a borrowed car. The Gurskis testified that, while Miss Harding had been drinking, she did not seem drunk. They further testified that the defendant was not intoxicated at that time. The defendant testified that while he had nothing to eat between noon and 11 p.m., that he had drunk two 6-packs of 12 oz. cans of beer, had smoked part of a marijuana cigarette and had drunk 7-8 pint cans of malt liquor in that order. He further testified that at about 11 p.m., when he and Miss Harding arrived at the deserted area near the railroad tracks where the killing took place, he drank a can of malt liquor and ate a double capsule of mescaline. The defendant then related his story that the deceased tried to make love to him and that he rejected her. She then made numerous attempts at suicide and argued with the defendant until he lost control of himself and stabbed her to death with the screwdriver.

At the trial defendant's counsel argued several theories of defense, including insanity and voluntary manslaughter. The trial judge refused to instruct the jury on voluntary manslaughter but did give an instruction on insanity. We consider first defendant's contention that the trial court erred in refusing to instruct the jury on the voluntary manslaughter and, therefore, the conviction should be reversed and remanded for a new trial or, alternatively, the conviction should be reduced to voluntary manslaughter as a matter of judicial economy. Defendant presents alternative theories in support of this contention. Defendant first argues that there was sufficient evidence of serious provocation by the deceased to warrant the giving of the voluntary manslaughter instruction and verdict form. Secondly, defendant argues that provocation is not the sole means by which the required specific mental intent for murder can be negated. Defendant argues that the evidence demonstrated that his voluntary intoxication, drugged condition and mental abnormality negated the requisite specific intent for murder, therefore, he was guilty of voluntary manslaughter, a general intent offense, and the jury should have been so instructed. We shall treat these arguments together.

■■ The general rule is that in a murder trial, where there is any evidence in the record which, if believed by the jury, would reduce the crime to manslaughter, then it would be error to refuse to give such a tendered instruction. However, it is equally well settled that such an instruction should not be given if the evidence clearly demonstrated that

the crime was murder and there is no evidence to support the conviction of manslaughter. *People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131.

Section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1969, ch. 38, par. 9—2) provides that a person killing an individual without justification "commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by: (1) The individual killed * * *. Serious provocation is conduct sufficient to excite an intense passion in a reasonable person."

In *People v. Crews* (1967), 38 Ill. 2d 331, 335, 231 N.E.2d 451, 453, the supreme court, in discussing serious provocation, stated: ·

"The only categories of serious provocation which have been recognized are: 'substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse; but not mere words or gestures or trespass to property.'"

Defendant herein contends that there was substantial evidence of serious provocation by the victim and that this evidence was sufficient to constitute a "mutual quarrel" that would reduce the killing to voluntary manslaughter. The evidence of the alleged mutual quarrel, as testified to by the defendant, was that the victim attempted to seduce him; that he rejected her and that she then attempted to commit suicide, which he prevented. They quarreled about their relationship and all this seriously provoked him into killing her.

Conceding the veracity of defendant's testimony as to the events which led up to the killing, we fail to see that a quarrel about a relationship between the parties, an attempt at seduction by the woman, and the victim's alleged attempts at suicide could in any way result in such "serious provocation" that would engender intense passion in a reasonable man. The trial court found that defendant's evidence, even if believed, would not warrant the jury to find defendant guilty of voluntary manslaughter. We concur in that determination and find that the refusal of the tendered voluntary manslaughter instruction was proper. *People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131.

We next consider defendant's further contention that the evidence of his alleged voluntary intoxication, drugged condition and mental abnormality negated the requisite specific intent to constitute murder. In *People v. Gonzales* (1968), 40 Ill. 2d 233, 241, 239 N.E.2d 783, 789, our supreme court was faced with the same question we have before us. There the court said:

"The defendant contends there was sufficient evidence in the record from which the jury could have found him to have been so intoxicated on the night of the shooting as to suspend his power of reason and that, therefore, the trial court should not have refused to give an instruction on manslaughter. In order to raise the defense

of drunkenness as a defense to a crime requiring intent, the accused must show that this drunkenness existed to such a degree as to render the accused wholly incapable of forming such intent."

But, the court went on to say:

"Furthermore, the coherent and detailed nature of the statements themselves clearly indicate that the defendant had a cognizance of the events immediately prior to the shooting which belies any arguments that his power of reasoning had been suspended. [Citation.] We believe that the evidence clearly demonstrates that the killing was a murder, and that consequently no error was committed by the trial court's refusal to give an instruction on manslaughter." (40 Ill. 2d 233, 242, 239 N.E.2d 783, 789.)

In the case before us the defendant recalled in detail the alleged amount of beer, malt liquor and drugs that he allegedly consumed prior to the killing, and here as in *Gonzales* he further recalled all the events and incidents in detail leading up to the killing. Finally, as pointed out in *People v. Aguirre* (1975), 30 Ill. App. 3d 854, 857, 334 N.E.2d 123, 126, the State can rebut the defendant's evidence of intoxication by either expert testimony or by evidence of lucid periods before, during or after the voluntary act.

Defendant further argues that the testimony of the defendant's psychologists established that the defendant was seriously provoked under the above factual situation. In response to the defendant's hypothetical question based on some of the facts in evidence, Dr. Scher opined that the individual in the hypothetical suffered from "an acute and organic brain syndrome," "mental disease," caused by the alcohol and mescaline. That, as a result of the mescaline and alcohol, the person did not possess a substantial capability of conforming his conduct to the requirements of the law. Dr. Scher also examined the defendant and found that he was a borderline or "latent schizophrenic" who displayed schizophrenic features only when under particular stress. Dr. Scher felt that the long term relationship between the defendant and Miss Harding could have put the defendant under considerable stress. He concluded that the defendant killed Miss Harding as the result of the ingestion of mescaline and alcohol, acting upon the personality of the defendant. Dr. Scher further testified that without the mescaline defendant might possibly have committed the homicide without comprehending the criminality of his conduct. However, he stated it was less likely.

Dr. Lerner, in response to the defendant's hypothetical question, stated that the individual was suffering from some sort of "organically induced psychotic condition" which "severely impaired his capacity to understand the criminality or noncriminality of his acts." He stated that without the mescaline his opinion would change.

In response to the State's hypothetical question, which contained more facts than the defendant's, the State's witness Dr. Tuteur opined that the individual was not suffering from a mental disease and was capable of understanding the criminality of his conduct. Dr. Tuteur also examined the defendant and found no mental disease or defect. In discussing "rage," Dr. Tuteur explained that rage was an emotional condition by which a person is provoked and angered, but that rage is not a mental disease.

Dr. Feinerman also testified for the State. In response to the State's hypothetical question he stated that the individual was not mentally ill and was capable of understanding the criminality of his acts. Dr. Feinerman also examined the defendant and found he was not mentally defective or mentally diseased. Dr. Feinerman later concluded:

> "With the causative effects of mental illness and chronic brain disease eliminated, what is left?
> Only the rage we all must contain when we are frustrated and unable to resolve our resultant anxieties."

Dr. Fiorese, Chief of the Illinois Bureau of Toxicology, a witness for the State, testified that mescaline will appear in the blood one-half hour after ingestion and that its optimum concentration will be two hours after ingestion. He testified that it takes 24 hours for the body to excrete 84% of the mescaline. He concluded that if a person took mescaline at 11 p.m. and blood was extracted at 3:10 a.m., four hours later, that the test would reveal evidence of the mescaline in the blood. Dr. Bruetman, a neurologist, testified that mescaline has its strongest effect upon the user about one hour after ingestion. He also stated that a person who vomited within a half hour of taking the drug would have taken a portion of the drug out of his system. The shorter the time period the greater the amount of the drug he would lose. He also testified that it was possible to take it all out of his system if done within five minutes of ingestion. The defendant testified that within a half hour of eating the mescaline that he became sick and vomited.

The record discloses that immediately before the incident the Gurskis testified defendant was not intoxicated. He then drove from the Gurski home to the scene of the killing. Immediately after the killing the defendant drove to the police station. Officer Hoyer, who gave the defendant his *Miranda* rights, testified that the defendant was not under the influence of alcohol shortly after 12 p.m. Defendant's own testimony of the events leading up to, and after the killing, shows that he was not drunk or under the influence of drugs. He stated that he twice pulled Miss Harding away from in front of moving trains before the killing, that immediately prior to the stabbing Miss Harding called him a bastard but

that he remained calm and that during the stabbing he remembered seeing the screwdriver "in a type of tracer." After the killing he testified that he tried to take her pulse and checked for her breathing with a shiny part of a beer can. He then drove to the police station. Finally, the defendant's blood test revealed that at 3:10 a.m. he had 0.075% alcohol in his blood and no drugs. While the blood test proves that the defendant had been drinking, it does not prove that he was drunk at the time of the crime. Furthermore, it is proof that he was not under the influence of mescaline.

■■ In other words, when the record is examined in its entirety, Dr. Scher testified that without mescaline defendant might possibly have committed the killing because of his mental condition but even he stated that it was less likely. All of the other psychiatrists testified that if there were no mescaline then the defendant must have committed the crime in a fit of rage. The evidence revealed that the defendant was neither as drunk as he said he was nor under the influence of mescaline at the time of the killing. The State completely rebutted the defendant's contention of lack of specific intent due to intoxication or drugs by both expert witnesses and the defendant's lucid periods before, during and after the offense. Furthermore, we note that while the voluntary manslaughter instruction was not given, the court did instruct the jury that:

> "An intoxicated or drugged person is criminally responsible for his conduct unless his intoxication or drugged condition renders him incapable of acting knowingly or intentionally."

We find that the evidence clearly demonstrates that the defendant was neither provoked nor so intoxicated that he did not understand the nature and consequences of his actions. The evidence clearly demonstrates that the crime was murder and no evidence supports a conviction of voluntary manslaughter.

The defendant's next contention is the trial court's failure to give the requested manslaughter instruction and verdict form violated defendant's right to due process and equal protection of the law. The State's initial response is that, since the defendant failed to argue this issue at the trial or in the written post-trial motion, that under Supreme Court Rule 366(b)(2)(iii) (Ill. Rev. Stat. 1975, ch. 110A, par. 366(b)(2)(iii), the defendant has waived this issue. While we agree with the State that the defendant has not argued the issue either at the trial or in the written post-trial motion, we note the Supreme Court Rule 451 on instructions provides, in subsection (c), that "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." (Ill. Rev. Stat. 1975, ch. 110A, par. 451(c).) Since the defendant's argument is based upon constitutional issues, we feel that it is in the interest of justice and fundamental fairness that we consider this issue.

Defendant's contention is that the trial court has absolute discretion in determining whether or not to instruct the jury on the voluntary manslaughter issue. He further contends that since the law in Illinois does not provide any guidelines upon which the judge may base his decision, that the procedure violates the defendant's right to due process and equal protection of the law. (*United States ex rel. Mathews v. Johnson* (3rd Cir. 1974), 503 F.2d 339.) However, we do not agree. As the State points out in their supplemental brief, while whether or not to give an instruction on voluntary manslaughter is within the trial court's discretion, the law in Illinois does provide very clear guidelines upon which the judge should base his decision. (See *People v. Handley*.) In light of the guidelines set down by the Illinois Supreme Court and the fact that the issue is reviewable by our court, we do not find that the defendant was denied his right to due process and equal protection of the law under this method of determining which jury instruction should be tendered. Finally, we find this case to be analogous with *United States ex rel. Wilson v. Essex County Court* (D.N.J. 1976), 406 F. Supp. 991, 1000, where that court held that the New Jersey trial court's refusal to give a voluntary manslaughter instruction did not violate the defendant's right to due process or equal protection of the law. That court said:

> "* * * a jury does not have the automatic right to return a verdict of manslaughter in any murder prosecution, that the trial judge must determine whether the evidence in the case warrants a manslaughter instruction before administering one, and his decision is subject to review. [Citation.] * * * Under the circumstances, this court is satisfied that no federal right is abridged when no manslaughter charge is administered because a judge determines that no rational view of the evidence would support it."

We agree with the reasoning in *Essex County* and find it to be controlling in this situation.

The defendant's next contention is that he was deprived of a fair trial because of the prejudicial closing remarks of the prosecutor. The record reflects that defense counsel, in his closing argument, stated:

> "What is the immediate, overriding, spontaneous or bird's eye view or reaction to this case?
>
> If you read—and you indicated that you hadn't, but let's assume that you picked up the paper and read, 'Boy Stabs Girl 42 Times', what is the first reaction?
>
> He'd have to be crazy to do that."

The State's Attorney, in his closing arguments, in rebutting the above statement of the defense counsel, stated:

> "He said to you, 'If you talk to somebody and you tell them that

they [*sic*] were stabbed 42 times the first thing that they say—'and I don't know who these 'they' are—but, anyway, that he must be crazy.

Well, if that would be the case then any crime which is rather serious, you've got to walk them right out of the courtroom, ladies and gentlemen, as being insane.

But you know better than anyone in this particular community—

MR. SHERWIN: That's objected to, Judge.

THE COURT: That objection is overruled.

MR. SHERWIN: I might state the reason. I'd like to be heard on it.

(Conference.)

MR. LARIA: May I proceed, your Honor?

THE COURT: Proceed.

MR. LARIA: Thank you.

So, ladies and gentlemen, you know better than anybody else in this community, by the evidence that you have heard from the expert witnesses, that that in and of itself does not say that a person is crazy, if you want to use crazy.

I'd rather talk about mental disease or mental defects, because those are the terms that you are going to be dealing with.

We have had the experts examine him and they don't find this, they don't find any mental disease or mental defect."

Defendant argues that this was a very close case. The defendant feels that there was substantial evidence presented indicating that defendant was insane at the time of the offense and that the jury had a very difficult task in attempting to evaluate the conflicting psychiatric testimony. Defendant admits that there are no Illinois cases on point but contends that Illinois law prohibits appeals to the fears of the jury based upon matters not in evidence and further prohibits reference in closing arguments of possible punishment as being irrelevent and immaterial. Defendant concludes that under these circumstances it was reversible error for the prosecutor to direct the jury's attention to the possible consequences of acquittal by reason of insanity.

■■ After a careful examination of the record herein, we are of the opinion that the defendant was not substantially prejudiced by the closing remarks of the State's Attorney. We disagree with the defendant's contention that this was a close case. When asked if the mescaline were withdrawn from the hypothetical question, all but one of the testifying psychiatrists stated that the defendant would not be suffering from any mental disease or defect. The testimony of the individuals who came in contact with the defendant both before and after the homicide, indicated that he was not under the influence of drugs or intoxicated by alcohol.

Finally, the blood test proved that the defendant did not have any mescaline in his blood system after the murder. In light of the fact that the Assistant State's Attorney's comments were both in response to the defendant's contention of insanity and an isolated incident, we do not find that these statements significantly contributed to the conviction of the defendant. Under these facts we hold this was not reversible error.

■■ The defendant next contends that he must be given a new sentencing hearing because the trial court did not order a presentence report or have sufficient background information on the defendant to make a valid sentencing judgment. Initially we note that the defendant was sentenced on December 21, 1970, prior to the adoption of the Unified Code of Corrections' present requirement that before sentencing the judge must have a presentence report. (Ill. Rev. Stat. 1973, ch. 38, par. 1005—3—1.) Defendant contends that *People v. Bradford* (1971), 1 Ill. App. 3d 38, 272 N.E.2d 259, is controlling. We find *Bradford* to be totally distinguishable from the case before us. In *Bradford* the defendant pled guilty, there was no trial, no statement by the State's Attorney or defense counsel, and evidence of aggravation by the State and mitigation by the defense was waived. Thus, all the trial court had before it was the indictment, the plea of guilty and the recommendation of the State's Attorney.

In the case before us the court had detailed information of the killing and defendant's background. We find that the trial court had sufficient information upon which to sentence the defendant. We therefore hold that the trial court in the instant case complied with the requirements of the then existing statute (Ill. Rev. Stat. 1969, ch. 38, par. 1—7(g)).

■■ The defendant's final contention is that the sentence of not less than 45 nor more than 65 years imprisonment is excessive and should be reduced. Defendant cites *People v. Viser* (1975), 62 Ill. 2d 568, 586-87, 343 N.E.2d 903, 913, as authority that we should exercise our power under Supreme Court Rule 615 (Ill. Rev. Stat. 1975, ch. 110A, par. 615) to reduce the defendant's sentence. In *Viser* the Supreme Court reduced defendant's sentence from 199-200 years to 50-75 years, which reduced sentence is, of course, greater than defendant's sentence herein. The judge's sentence was not excessive.

Judgment of the trial court is affirmed in part and reversed in part and remanded with instructions for the trial court to amend the mittimus to show only one murder conviction.

Affirmed in part, reversed in part and remanded with instructions.

SEIDENFELD and DIXON, JJ., concur.