THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID L. ZYNDA, Defendant-Appellant.

Second District   No. 75-523

Opinion filed October 17, 1977.

Frank Wesolowski, Jr., Public Defender, of Wheaton (Robert Heise, Assistant Public Defender, of counsel), for appellant.

John J. Bowman, State's Attorney, of Wheaton (Malcolm F. Smith, Assistant State's Attorney, and Phyllis J. Perko and Stephen M. Deitsch, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE BOYLE delivered the opinion of the court:

The defendant, David L. Zynda, was indicted for and convicted in a jury trial in Du Page County, Illinois, of the murder of Irene Brooks in Downers Grove, Illinois. Defendant was sentenced to a minimum term of not less than 25 years nor more than 75 years.

On appeal the defendant assigns as error the following: (1) Whether the admission into evidence of certain items seized from his car at the time of his arrest was improper as the product of an illegal arrest or his involuntary consent? (2) Whether the admission into evidence of defendant's fingerprint card containing a prior arrest notation was improper? (3) Whether the trial court's refusal to give the jury defendant's tendered voluntary and involuntary manslaughter instructions was

improper? (4) Whether the evidence is sufficient to establish defendant's guilt beyond a reasonable doubt? and (5) Whether the sentence imposed was excessive?

Officer Victor Savannah of the Downers Grove police testified for the State that he was called to the home of Irene Brooks at approximately 9:45 on the morning of July 5, 1973, to investigate an unknown disturbance. Upon entering the Brooks home, he observed Irene Brooks lying on the bedroom floor, nude, with reddish marks around the victim's neck and blood around her lips and mouth. He testified that there was some butter lying on the floor between the victim's arm and her body. The officer further testified that there appeared to be no signs of forcible entry into the premises.

Du Page County Sheriff Terry Baldowski testified for the State that when he arrived at the deceased's home on the morning of July 5, the bedroom was in a general state of disarray, and the deceased appeared to have something smeared around her vaginal area.

Two neighbors testified that they heard noises emanating from the deceased's home in the early morning hours of July 5. Mrs. Eleanor Steininger, who lived across the street from the victim, testified she heard a series of screams in the direction of the deceased's home shortly prior to 3 a.m. on July 5. Mr. Lewis Zak, whose residence was 30-40 feet from the deceased's, testified for the State that he was awakened on the night in question by noises coming from the victim's residence. Mr. Zak further testified he heard "muffled sighs" as well as a "thumping crunch" coming from the direction of the deceased's home.

Dr. Banglor V. Ramakrishna, a physician and pathologist, performed an autopsy on the victim at approximately 3:30 on the afternoon of July 5, 1973. He testified for the State that it was his opinion that the victim had been dead at least 9-10 hours prior to his autopsy. The doctor testified that the victim had multiple injuries of recent origin over both her forehead and neck and had blood around her mouth, right collarbone, right shoulder and both thighs. He testified that in his opinion the cause of death was asphyxia as a result of manual strangulation. The witness further stated that there was dried fecal matter on the body, specifically on the abdomen, shoulder, and ankle. The witness testified that the hyoid bone in the deceased's larynx was fractured and that the contents of the deceased's stomach were light red in color and were in a semidigested state. This indicated to the doctor that approximately four to five hours prior to her death, the deceased had ingested food material containing red coloring, capable of producing a red color. The witness also stated that the deceased's internal lining of her rectum and anus were exposed and outside the body, rather than inside. Francis Tham, a medical technologist, testified for the State that 11.4 units of the enzyme,

acidphosphatase, was found in the body of the deceased. Acidphosphatase is produced by the male prostate gland.

Donald E. Schmidt, an evidence technician assigned to the fingerprint division of the Du Page County sheriff's office, testified for the State that the following latent fingerprints and palm prints were lifted from the deceased's home: (1) a latent fingerprint was removed from the cold-water knob on the sink faucet; (2) two palm prints were lifted from the refrigerator; (3) one fingerprint was taken from the refrigerator; (4) a latent palm impression was removed from the headboard of the deceased's bed next to the deceased's nude body; and (5) another latent print was found on the dresser in the same bedroom. Officer Robert Wilson of the Du Page County sheriff's office testified for the State that he compared these fingerprints and palmprints collected with the fingerprint card of the defendant made as a result of a previous, unrelated arrest, and he stated that it was his opinion that the same person made all the fingerprints.

At the trial of the cause, Edward Ritter testified that he gave a party on July 4, 1973, which was attended by, among others, the defendant. Ritter testified that the defendant was drinking beer that afternoon, but that he had had no difficulty understanding the defendant. The witness stated that he purchased some LSD, a powerful street drug, from Rick Neulen, which was contained in a piece of tinfoil. Ritter testified that he gave this tinfoil to the defendant, although he never ascertained that the tinfoil contained "acid." Ritter further testified that the party switched to the defendant's residence early in the evening, whereupon the defendant continued drinking beer and set off some fireworks until approximately midnight.

Mark Guzzoldo testified for the State that he was with the defendant until approximately 11:45 p.m. on July 4, 1973, and that he returned to the defendant's house early the next morning after an evening of work in Downers Grove. The witness at that time commented to the defendant about the police cars across the street from the defendant's house, and the defendant made no response. Later, upon their return from a short errand, the witness testified that the defendant stated, in reference to the police cars across the street, "I think I did something." The defendant then gathered all his belongings in a green garbage bag. Guzzoldo testified that included in these items belonging to the defendant was a woman's purse, which the defendant when asked if it belonged to someone across the street, replied that he did not know and further stated that he did not want to know whose it was. The witness testified that the purse taken from the defendant's trunk in Littleton, Colorado, at the time of his arrest could have been the same purse the defendant showed him on July 5, 1973. Guzzoldo then testified that the defendant left on the

morning of July 5 with all his belongings and did not tell the witness where he was going.

Prior to the commencement of the jury trial, the trial court conducted a hearing on the defendant's motion to quash his arrest and to suppress evidence. The trial court, after a lengthy hearing, denied the defendant's motions to quash his arrest and to suppress the evidence seized thereunder.

The first issue presented on appeal concerns the legality of the warrantless arrest of the defendant and the ensuing search of the defendant's automobile carried out with his purported consent, and the admission into evidence of the physical items seized thereunder. Defendant contends that his arrest in Littleton, Colorado, was unlawful because the complaint for the arrest warrant omitted any operative fact or information regarding the circumstances which would support a conclusion that the defendant, in fact, perpetrated the offense. Defendant's contention is premised on two factors: (1) That the complaint on which his arrest was based is conclusionary; and (2) That no information was transmitted from the Du Page County sheriff's office to the arresting officers in Colorado which would support the conclusions in the complaint.

Defendant's argument is that since he was illegally arrested, the victim's purse and checkbook, were also illegally acquired. (*Whiteley v. Warden of Wyoming State Penitentiary* (1971), 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031; *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.) However, defendant's argument fails because the Colorado police had probable cause to properly arrest the defendant because they believed that he had committed a crime based on the information that was furnished to them by the Du Page County authorities.

■■ The text of when a police officer has probable cause to arrest was stated by our supreme court in *People v. Macias* (1968), 39 Ill. 2d 208, 213, 234 N.E.2d 783, 786-87, *cert. denied*, 393 U.S. 1066, 21 L. Ed. 2d 709, 89 S. Ct. 721:

> "We have held that the test of probable cause is whether a reasonable and prudent man in possession of the knowledge which has come to the arresting officer would believe the person to be arrested is guilty of the crime; that it is something less than evidence that would result in conviction and may be founded on hearsay evidence; that it is based upon the factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act. *People v. McCrimmon*, 37 Ill. 2d 40; *People v. Jones*, 31 Ill. 2d 42."

In the instant case, one of the arresting officers, Sergeant Delbert

Campbell of the Littleton police, testified that the following facts were communicated to him at 12:45 p.m. Central Time by Detective Edward Ley of the Du Page County sheriff's office: (1) That there was going to be a money order for David Zynda at the Western Union office in Littleton, Colorado; (2) That there had been prints recovered from the home of the deceased, Irene Brooks, and that these prints matched the prints of David Zynda from a previous arrest; (3) That the Du Page County sheriff was in the process of obtaining a warrant which would be forwarded to Littleton when it was obtained; (4) That the defendant might be staying at the home of Thomas Youngman in Littleton, Colorado; (5) That David Zynda would be driving a white-over-green 1970 Lincoln with Illinois plates KN 8321; (6) That he was approximately 21 years of age, 5'6", 130 lbs., with long, blond hair; and (7) That the defendant had left Illinois on the 5th of July and that the defendant was a suspect in the murder of Irene Brooks which occurred on July 4, 1973. Detective Ley's testimony was that on July 11, 1973, at 12:45 p.m. Central Time, he communicated the above information to Sergeant Campbell of the Littleton, Colorado, police and informed Sergeant Campbell that a detective was in the process of having the warrant signed at that time. The warrant was, in fact, signed at approximately 1 p.m. Central Time by Judge William E. Black of Du Page County.

■■ Thereafter, based on the above information communicated to the Littleton counterparts by the Du Page County sheriff's office, the Colorado officers arrested the defendant outside the Western Union office in Littleton at approximately 1:40 p.m. Central Time. Generally, it is recognized that "officers, acting as reasonable and prudent men and in furtherance of efficient law enforcement procedures, ha[ve] no choice but to proceed to make [an] arrest as quickly as possible." (*People v. Macias*, 39 Ill. 2d 208, 214, 234 N.E.2d 783, 787.) In the instant case, this is especially so, in light of the quick manner in which the defendant departed Illinois on the morning of the discovery of the deceased's body. Based on the information which the Littleton police had been furnished, we find that the police had independent probable cause to believe that the defendant had committed the offense of murder and that his arrest was lawful. *People v. Macias* (1968), 39 Ill. 2d 208, 234 N.E.2d 783; *People v. Taylor* (1974), 58 Ill. 2d 69, 317 N.E.2d 97; *People v. Clark* (1976), 43 Ill. App. 3d 117, 356 N.E.2d 1144.

Defendant's next contention is that even if the arrest were valid, the defendant's consent to search his automobile was invalid because it was obtained as the result of implicit police coercion. Defendant's testimony at the motion to suppress was that after he was taken to the Littleton police station, he was advised of his *Miranda* rights and that he asked to see an attorney, but that he was denied access to an attorney for

approximately half an hour. He testified that while he was in the police interrogation room, Sergeant Campbell asked him if it was okay to search his car, and the defendant refused. He testified that Sergeant Campbell then showed him a waiver for a search warrant form and told him, "The courthouse is right next door; we can have a search warrant within 5 or 10 minutes. If you cooperate with us, things will go a lot easier." Defendant then signed a waiver for search warrant form, and the officers found the deceased's purse and checkbook in their search of the defendant's automobile. Subsequently, after consulting with an attorney, the defendant revoked his previously given consent to search his car.

Defendant's testimony as to his alleged coerced consent is contradicted by two Littleton police officers. Officer Robert Walker testified that after the defendant was advised of his *Miranda* rights, he advised the defendant concerning the search of his car and that no one was abusive toward the defendant to coerce him to sign the waiver. Officer Walker further testified that after reading the consent form to the defendant, the defendant then signed it in the presence of himself and Detective Robert R. Strong. Officer Walker did not remember Sergeant Campbell or himself ever mentioning a search warrant to the defendant or stating that they could obtain a search warrant for defendant's car.

Sergeant Campbell's testimony substantially corroborated the testimony of Officer Walker. Sergeant Campbell testified that he asked the defendant if he would give them permission to search his automobile. Sergeant Campbell testified further that he observed the defendant sign the search warrant waiver after it was read to him and that the defendant "told us to go ahead and search his car if we wanted to."

■■■ The test to determine whether defendant's consent to search is voluntarily given or coerced "is a question of fact to be determined from the totality of all the circumstances." (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 227, 36 L. Ed. 2d 854, 863, 93 S. Ct. 2041, 2048.) Further, the burden of proof is clearly on the State in a warrantless search, to prove that any consent to search was freely and voluntarily given. (*United States v. Tolias* (9th Cir. 1977), 548 F.2d 277.) The question of whether a consent to search was validly given in the instant case is " ' * * * a factual matter to be determined in the first instance by the trial court, and where the evidence on the issue is in conflict this court will accept the finding below unless it is clearly unreasonable. [Citations.] Because a court of review is not in a position to observe the witness as he testifies, questions of credibility and the weight to be given his testimony must be left largely in the discretion of the trial court.' " (*People v. DeMorrow* (1974), 59 Ill. 2d 352, 358, 320 N.E.2d 1, 5.) Here the credibility and weight to be given the conflicting testimony of the two officers as opposed to the testimony of the defendant was a factual determination to be made by the trial court.

The trial court denied the defendant's motion to suppress the evidence obtained in the search and obviously accorded greater weight to the testimony of the two officers. This determination is clearly not unreasonable in light of the factual consistency in the officers' testimony, which clearly establishes that the defendant was not coerced and that he consented to the search by signing the waiver and orally consenting.

In the instant case, "the totality of the circumstances" indicates that the defendant's consent to search his car was an " 'essentially free and unconstrained choice' " and that his consent was not obtained "because his 'will ha[d] been overborne and his capacity for self-determination critically impaired.' [Citation.]" (*United States v. Watson* (1976), 423 U.S. 411, 424-25, 46 L. Ed. 2d 598, 609, 96 S. Ct. 820, 828.) Defendant was clearly given his *Miranda* rights and his arrest was based on probable cause. There is no evidence that defendant was mentally deficient in any way nor unable to exercise free choice at the time of his arrest. The mere fact that the defendant is in custody is not enough to establish coercion. The evidence detailed by the Littleton officers regarding defendant's arrest does not prove any coercive activity on the part of the police which would make the defendant's consent to search his car involuntary. The evidence also establishes that the defendant signed the consent waiver after it was read to him and, according to Sergeant Campbell, the defendant also verbally consented to the search of his car. Thus, the State clearly proved that the defendant's consent to search his car was freely and voluntarily given. (*United States v. Watson* (1976), 423 U.S. 411, 46 L. Ed. 2d 598, 96 S. Ct. 820; *United States v. Tolias* (9th Cir. 1977), 548 F.2d 277.) The evidence, consisting of the purse and the deceased's checkbook, was obtained pursuant to defendant's voluntary consent to search and was properly admitted.

Defendant's second assignment of error on appeal is that the trial court erred in receiving testimony from the State's expert witness, Officer Robert Wilson, a fingerprint technician from the Du Page County sheriff's office. Officer Wilson's testimony was that the latent prints taken from the dresser and cold-water faucet of the deceased's bedroom on the day of the crime and the fingerprints the defendant made at the time of his arrest matched those on a fingerprint card of the defendant made on August 2, 1972. This 1972 fingerprint card, which was submitted into evidence as Exhibit No. 59 (hereinafter referred to as Exhibit No. 59), was made when the defendant was arrested for a wholly unrelated charge, for which the defendant was subsequently acquitted. Defendant's motion for a mistrial, which was made after the initial introduction of this card into evidence, was denied by the trial court after a hearing. Officer Wilson testified on two occasions that Exhibit No. 59 was compared to two fingerprint cards (Exhibit No. 61 and Exhibit No. 65) made by the

defendant subsequent to his arrest. Officer Wilson stated that in his opinion the same person made both fingerprints. He also testified that the fingerprints on Exhibit No. 59 matched the latent prints found on the cold-water faucet and dresser in the deceased's bedroom immediately after the crime.

The defense agrees that Exhibit No. 59 was admissible to show why the defendant was initially identified as a suspect when his prints were found in the decedent's bedroom. However, the defense contends that the State's repeated reference to Exhibit No. 59 was unnecessary after the initial purpose for admission was served and other fingerprint cards of the defendant taken subsequent to his arrest (*i.e.*, Exhibit No. 61 and Exhibit No. 65) were available and admitted into evidence. The defense points out that the State could have easily compared the latent fingerprints found in the deceased's bedroom with those of the defendant taken after his arrest and admitted as Exhibit No. 61. Thus, the defense argues that these continued references to Exhibit No. 59 drove home to the jury the inference of defendant's past criminality. We agree.

Generally, evidence which establishes commission of crimes other than those for which the defendant is being tried is inadmissible, except where the evidence is relevant to place the defendant in proximity to the time and place of the present criminal charge, or aids in establishing identity, or tends to prove design, motive or knowledge. (*People v. Cage* (1966), 34 Ill. 2d 530, 216 N.E.2d 805. See also *People v. Butler* (1975), 31 Ill. App. 3d 78, 334 N.E.2d 448; *People v. Sutton* (1976), 43 Ill. App. 3d 1008, 357 N.E.2d 1209.) In *Butler* the court noted that it is not sufficient that the evidence be admissible to establish the identity of the defendant under an exception to the general rule of inadmissibility, but "[r]ather, the actual need for the evidence must be considered in light of the relevant issues and the other evidence available to the prosecution and must be balanced against the prejudicial effect its admission will have upon the jury." 31 Ill. App. 3d 78, 80, 334 N.E.2d 448, 450.

■■ In our case, the repeated, unnecessary reference by the State to defendant's prior fingerprint card (Exhibit No. 59), after its initial purpose of identifying the defendant was served, in our judgment, constituted error. It is manifest, however, that this error does not by itself constitute reversible error. (*People v. Hudson* (1972), 7 Ill. App. 3d 333, 338, 287 N.E.2d 297, 301.) While the prejudicial effect upon the jury of using this prior fingerprint card beyond its proper scope is to be questioned, it cannot be said that this error deprived the defendant of a fair trial in light of the overwhelming evidence against the defendant, which clearly established his guilt in this cause. (*People v. Bartels* (1975), 30 Ill. App. 3d 551, 333 N.E.2d 457.) Defendant has cited cases for the proposition that the resulting prejudice clearly exceeds the probative value of this

evidence. We find these citations to be inapplicable to the case at hand, where the source of the fingerprints was not stated to the jury and any prior criminality that the jury would derive from these fingerprints had to be entirely inferential on its part. Unlike defendant's citations, there are not involved here clearly prejudicial statements that would alert the jury that the defendant had been involved in a different offense at an earlier date, nor mug-shots of the defendant, the probative value of which would be clearly outweighed by their prejudicial effect. (See *People v. Butler* (1975), 31 Ill. App. 3d 78, 334 N.E.2d 448; *People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297.) Therefore we hold that the use of this prior fingerprint card beyond its proper scope constitutes harmless error beyond a reasonable doubt.

■■ Defendant's next assignment of error is that the trial court erred in refusing to give the jury tendered instructions concerning the offenses of voluntary and involuntary manslaughter. It is well settled that in a murder trial, if there is any evidence in the record which, if believed by the jury, would reduce the crime to manslaughter, it would be error for the trial court to refuse to give such an instruction. However, these instructions should not be given if the evidence clearly demonstrates that the crime was murder and there is no evidence in the record to support a manslaughter conviction. (*People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131; *People v. Jacobs* (1976), 44 Ill. App. 3d 290, 357 N.E.2d 821.) We will deal first with the propriety of the voluntary manslaughter instruction in this case.

Section 9—2(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 9—2(a)) provides that:

> "A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) the individual killed, * * *.
>
> Serious provocation in conduct sufficient to excite an intense passion in a reasonable person."

As used in the cited statute, serious provocation has been confined to the following categories: " 'substantial physical injury or assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse; but not mere words or gestures or trespass to property.' " *People v. Crews* (1967), 38 Ill. 2d 331, 335, 231 N.E.2d 451, 453. See also *People v. Free* (1976), 37 Ill. App. 3d 1050, 347 N.E.2d 505.

■■ Defendant first contends that there was enough evidence of serious provocation by the victim and that this evidence was sufficient to establish that there had been an extremely violent sexual tryst or a passionate argument, which would reduce the killing to voluntary

manslaughter. The defense's evidence on this point, however, consists only of defendant's own inferences totally unsupported by the record. There is no evidence of any kind that the deceased provoked her death in any way. On the contrary, the evidence establishes that the deceased was violently strangled and sexually abused in the early morning hours of July 5 by the accused. The defense attempts to conjure up for this court and the trial court hypothetical situations wholly unsupported by the record. There is no evidence of a prior sexual relationship between the parties, just as there is no evidence of a violent argument. The trial court, although noting that the defense's theory was "within the realm of possibility", found that defendant's theory and inferences, even if believed, did not warrant giving a voluntary manslaughter instruction to the jury. We agree with this determination and hold that the refusal of the tendered voluntary manslaughter instruction was proper.

■■ Defendant further contends that there was sufficient evidence in the record from which the jury could have found him to have been so intoxicated or drugged on the night of the murder as to negate the intent or knowledge requirement for murder. (See Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a).) He argues that the jury could have inferred that he was so intoxicated and drugged at the time the deceased was killed that he could not have formed a specific intent nor possessed the knowledge necessary to commit murder. In order to assert an intoxication or drug defense to a crime requiring a specific intent, the accused must show that this intoxication or drug condition existed to such a degree as to render the defendant wholly incapable of forming the requisite intent. *People v. Gonzales* (1968), 40 Ill. 2d 233, 239 N.E.2d 783; *People v. Garrett* (1977), 46 Ill. App. 3d 592, 360 N.E.2d 1231; *People v. Miner* (1977), 46 Ill. App. 3d 273, 360 N.E.2d 1141.

The overwhelming testimony of the witnesses, however, does not establish that the defendant was so intoxicated or drugged as to be wholly incapable of forming the requisite intent for murder.

Rick Nuelen, who sold the LSD "acid" to Ed Ritter, testified for the State that he noticed nothing unusual about the defendant's speech when he talked to him at 11:30 p.m. on July 4, 1973. Doreen Laskey testified for the State that when she observed the defendant at 10:30 p.m. on July 4, 1973, she did not notice anything unusual about his speech or in the manner that he walked or drove an automobile. Keith Kranz also testified for the State that he observed nothing unusual in the defendant's speech on the night of July 4, 1973. Lynn Palmisano testified for the State that she observed the defendant smoking marijuana at his party and that he also told her he had ingested two hits of LSD. However, she specifically testified that she could understand the defendant and converse with him throughout the three hours she was at his party from 9 until 12 p.m. on

July 4. Elizabeth Mathias testified for the State that she observed the defendant around 10:30 p.m. and noticed nothing unusual about his walk. She further testified that the defendant was very friendly towards her at this time. Ed Ritter also testified that he noticed nothing unusual about the defendant's speech when he last saw the defendant at approximately midnight.

The evidence that the defendant was intoxicated or drugged consists of the testimony of two witnesses, Mark Guzzoldo and Lynn Palmisano, who testified that the defendant told them he took the LSD. Also, it appeared to Guzzoldo and Ray Youngman that the defendant was under the influence of drugs. Guzzoldo, however, testified that he was at all times able to understand the defendant and that he did not see him stumble or fall during the afternoon or evening.

In addition, Mary Ritter testified that in her opinion the defendant was intoxicated on the night in question, but she also testified that the defendant was not only capable of walking five blocks without any trouble immediately preceding 1 a.m., but that he also did not appear insensible at that time. This testimony, however, is far from enough to establish that the defendant had lost his power of reasoning at the time of the killing.

■■ In addition, it is clear that the State may rebut defendant's argument of intoxication by evidence of lucid periods, either before, during, or after the voluntary act. (*People v. Aguirre* (1975), 30 Ill. App. 3d 854, 334 N.E.2d 123.) In the instant case, the testimony is overwhelming that the defendant was acting normally and had not lost his sensibilities, either through intoxication or a drugged condition. The testimony clearly establishes that immediately prior to the killing, the defendant was capable of forming the requisite intent for murder, and that consequently the trial court properly denied defendant's request for a voluntary manslaughter instruction. *People v. Gonzales* (1968), 40 Ill. 2d 233, 239 N.E.2d 783; *People v. Miner* (1977), 46 Ill. App. 3d 273, 360 N.E.2d 1141; *People v. Jacobs* (1976), 44 Ill. App. 3d 290, 357 N.E.2d 821.

■■ Defendant next argues that error was committed by the trial court's refusal to give an instruction on involuntary manslaughter. Section 9—3(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 9—3(a)) provides that:

> "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly, * * *."

Defendant's argument is that the jury could have concluded, if given an

involuntary instruction, that based on the defendant's state of intoxication, he could not have specifically intended to murder the victim, but could have acted so recklessly because of his intoxication as to cause the death of the victim. We disagree. First, while we agree that voluntary intoxication may, in a proper case, reduce the degree of homicide from murder to voluntary manslaughter, so that a voluntary manslaughter instruction must be given to the jury, this is not such a case. However, voluntary intoxication will not reduce voluntary manslaughter another degree lower to involuntary manslaughter. (*People v. Cunningham* (1970), 123 Ill. App. 2d 190, 260 N.E.2d 10; *People v. Cooper* (1975), 30 Ill. App. 3d 112, 332 N.E.2d 166.) Thus, even assuming arguendo that the defendant was shown to be voluntarily intoxicated in this case (which he was not), voluntary intoxication is not an affirmative defense to involuntary manslaughter. *People v. Cunningham* (1970), 123 Ill. App. 2d 190, 260 N.E.2d 10.

■■ We have reviewed the evidence and do not find a single scintilla of evidence to support a theory or inference that the defendant acted recklessly toward the deceased in his violent, sexual assault and strangulation of the deceased. (*People v. Cooper* (1975), 30 Ill. App. 3d 112, 332 N.E.2d 166.) Accordingly, we conclude that the trial court did not abuse its discretion in refusing to instruct the jury on involuntary manslaughter. *People v. Miner* (1977), 46 Ill. App. 3d 273, 360 N.E.2d 1141.

Defendant also argues that the trial court violated his constitutional rights to a jury trial and to due process of law when it refused to give the jury voluntary or involuntary manslaughter instructions, because a jury could have concluded from the facts that he was guilty of either voluntary or involuntary manslaughter. This is merely a paraphrase or restatement of the specious argument previously advanced, which has been rejected. For the reasons already stated above, this argument is found to be without merit.

■■ Defendant's next assignment of error is that the State failed to prove him guilty of murder beyond a reasonable doubt, because the circumstantial evidence in the instant case does not establish the defendant's guilt as to exclude other reasonable, innocent hypotheses. We disagree. The evidence specifically shows that the defendant's palmprints and fingerprints were found in the deceased's bedroom and on the refrigerator from which the butter found near the deceased's nude body had been taken. Also, defendant's palmprints were found on the headboard of the deceased's bed and on the dresser. The deceased's purse and checkbook were found in the possession of the defendant in Colorado a few days after the murder. This purse was in the possession of the deceased during the afternoon and evening of July 4, only hours

before her death, according to the testimony of Martha Lackaff, who went shopping with the deceased on that day. Witness Guzzoldo testified that he saw the defendant about 7 a.m. on July 5, in possession of a purse that closely resembled that of the deceased. The testimony of Mrs. Steininger and Mr. Zak also established that there was a scream and a "thumping crunch" as well as muffled sighs at approximately 3 a.m., which appeared to emanate from the deceased's home. Thus, it is reasonable to conclude that the deceased was attacked around 3 a.m., that she was in possession of her purse at approximately 10 p.m., and that the defendant was in the possession of her purse at approximately 7 o'clock the following morning. These facts, in addition to the unexplained finding of the defendant's fingerprints in the deceased's bedroom and home, refute any reasonable hypothesis of innocence which the defendant might have. (*People v. Reno* (1975), 32 Ill. App. 3d 754, 336 N.E.2d 36.) In *Reno*, the court found in a much weaker evidentiary situation that "the unexplained presence of defendant's thumbprint on a package of cigarettes found in a purse which had been stolen from the [home of the deceased] during the same 2½-hour period of time in which a murder was committed in that residence is not consistent with any reasonable hypothesis of innocence" which the defendant might have. (32 Ill. App. 3d 754, 758, 336 N.E.2d 36, 39.) We therefore hold that the evidence clearly establishes the guilt of the defendant beyond a reasonable doubt.

Defendant next argues that the State failed to prove beyond a reasonable doubt that (a) the defendant had the requisite mental state for the crime of murder, and (b) that the defendant was capable of forming the requisite mental state for the crime of murder. We disagree. Section 9—1(a) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 9—1(a)) provides that:

> "A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
> (1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
> (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; * * *."

■■ The defense contends first that the circumstantial evidence adduced in the instant case fails to establish that the defendant, in causing the death of the decedent, either knew that his acts caused a strong probability of death or great bodily harm to the deceased or intended to kill the deceased, do great bodily harm to her, or knew that such acts would cause her death. The State, however, is only required to prove that the defendant acted in killing the deceased with the knowledge that his

acts created the strong probability of death or great bodily harm to the deceased. The evidence introduced at trial clearly showed that the deceased had multiple injuries over her head and neck, and the hyoid bone of the deceased, located in her voice box, was fractured. The decedent had blood around her mouth, right collar-bone, right shoulder and on both thighs. The deceased's bedroom was in a total state of disarray, the bed was pulled out from the wall and the light above the bed was ripped off the wall. A pathologist testified that the deceased had marks on her lower jaw and that an internal examination showed extensive soft-tissue contusion and interspacial bleeding in the soft tissues. Additionally, the pathologist testified that in his opinion the deceased died from asphyxia due to manual strangulation. It was also the testimony of the witness, Mark Guzzoldo, that the defendant said to him, "I think I did something", on the morning that the decedent's body was found. It is reasonable to infer from the above overwhelming evidence that the defendant acted with the knowledge that his actions created the strong probability of death or great bodily harm to the deceased. Indeed, it would strain reason to infer otherwise.

Defendant's next contention is that the State failed to prove beyond a reasonable doubt that the defendant was capable of forming the proper mental state for murder. This argument merely restates the contentions asserted with reference to the previously rejected arguments on manslaughter and intent. It is clear that when the defense of intoxication to the crime of murder is raised, the issue is not whether the defendant was intoxicated on the date in question, but whether the defendant had the requisite mental state for murder. (*People v. Huggy* (1974), 19 Ill. App. 3d 247, 311 N.E.2d 355.) Here there is testimony of six witnesses who observed and conversed with the defendant for extended periods of time and who were all of the opinion that he was capable of being understood and noted nothing unusual about his speech, his walk, or driving ability. The jury certainly could have concluded that the defendant was not under the influence of alcohol or drugs to such an extent as to negate his knowledge that his acts created the strong probability of death or great bodily harm or that the defendant's condition negated the requisite mental state. (*People v. Gonzales* (1968), 40 Ill. 2d 233, 239 N.E.2d 783.) We accordingly hold that the defendant was proved guilty of murder beyond a reasonable doubt.

■■ Defendant's final assignment of error is that the sentence imposed of 25-75 years was excessive in that it did not take into account the facts and circumstances of the crime and the rehabilitation potential of the defendant. In support of this argument the defense points to the defendant's noncontroversial school and employment records, the fact that the defendant had no prior record or convictions, and that the

810

defendant was under the influence of drugs and alcohol at the time of the murder. The State argues in rebuttal that this court should not reduce this sentence in light of the heinous nature of this crime wherein the sanctity of a 53-year-old woman's right to be secure in her own home was violated and she was brutally battered to death either before or after sexual intrusions were made upon her. We recognize that our authority to reduce a sentence should only be utilized where there is evidence of a manifest abuse of discretion by the trial court in imposing a sentence. (*People v. Bonner* (1967), 37 Ill. 2d 553, 229 N.E.2d 527.) This surely is not such a case. The trial court, after a hearing in aggravation and mitigation and consideration of a detailed presentence report, imposed a sentence of 25-75 years. We find nothing whatsoever to indicate this sentence to be excessive. Accordingly, we affirm the judgment of the circuit court of Du Page County.

Judgment affirmed.

SEIDENFELD and NASH, JJ., concur.